whether the expert testimony is reliable under Delaware law. Jurisdiction is retained.

QUADRANT STRUCTURED PRODUCTS CO., LTD., Individually and Derivatively on behalf of Athilon Capital Corp., Plaintiff Below, Appellant,

v.

Vincent VERTIN, Michael Sullivan, Patrick B. Gonzalez, Brandon Jundt, J. Eric Wagoner, Athilon Capital Corp., Athilon Structured Investment Advisors LLC, EBF & Associates, LP, Defendants Below, Appellees.

No. 338, 2012.

Supreme Court of Delaware.

Submitted: Oct. 23, 2013.
Decided: Nov. 7, 2013.

Lisa A. Schmidt, Catherine G. Dearlove, and Russell C. Silberglied, Esquires, Richards, Layton & Finger, P.A., Wilmington, Delaware; Of Counsel: Harold S. Horwich, Sabin Willett (argued), and Samuel R. Rowley, Esquires, Bingham McCutchen LLP, Boston, Massachusetts, for Appellants.

Collins J. Seitz, Jr., Garrett B. Moritz, and Eric D. Selden, Esquires, Seitz Ross

Aronstam & Moritz LLP, Wilmington, Delaware; for Appellees EBF & Associates, LP.

Philip A. Rovner, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware; Of Counsel: Philippe Z. Selendy, Nicholas F. Joseph (argued), and Sean P. Baldwin, Esquires, Quinn Emanuel Urquhart & Sullivan, LLP, New York, New York, for Appellees Athilon Capital Corp., Athilon Structured Investment Advisors LLC, Vincent Vertin, Michael Sullivan, Patrick B. Gonzalez, Brandon Jundt and J. Eric Wagoner.

Before HOLLAND, BERGER, JACOBS and RIDGELY, Justices, and SCOTT, Judge * constituting the Court en Banc.

JACOBS, Justice:

Pending before this Court is an appeal from an order of the Delaware Court of Chancery dismissing a complaint. The plaintiff below, appellant, Quadrant Structured Products Company, Inc. ("Quadrant"), holds certain Notes issued by Athilon Capital Corp. ("Athilon"), an allegedly insolvent Delaware corporation. The Notes are long term obligations covered by two separate trust indentures that are governed by New York law. The defendants-below are EBF & Associates, LP ("EBF"), which indirectly owns 100% of Athilon's equity;[1] Athilon Structured Investment Advisors ("ASIA"), an affiliated EBF entity, Athilon's board of directors, and (as a nominal defendant) Athilon.

In a two paragraph order issued on June 5, 2012, the Court of Chancery granted the defendants' motion to dismiss Quadrant's complaint, on the ground that all claims alleged therein were barred for failure to comply with the "no-action" clauses in the Athilon trust indentures. The dismissal order, a copy of which is attached to this Certificate as Exhibit A, cited two Court of Chancery decisions that the court found "directly on point": *Feldbaum v. McCrory Corp.*, 1992 WL 119095 (Del.Ch. June 1, 1992) and *Lange v. Citibank, N.A.*, 2002 WL 2005728 (Del.Ch. Aug. 13, 2002). In both cited cases the Court of Chancery, applying New York law, held that those bondholder actions were barred by the no-action clauses of the respective trust indentures that governed the bonds at issue.

The plaintiff, Quadrant, appealed to this Court. By order dated February 12, 2013, this Court remanded the case to the Court of Chancery with directions to analyze the significance under New York law (if any) of the differences between the wording of the no-action clauses at issue in the two cited cases and in this Athilon case. A copy of this Court's remand order is attached to this Certificate as Exhibit B.

On June 20, 2013, the Court of Chancery, in a detailed and highly textured analysis of relevant New York case law, issued a Report on Remand, a copy of which is attached to this Certificate as Exhibit C. In its Report, the Court of Chancery held that: (i) "the language of the Athilon no-action clause distinguishes this case from *Feldbaum* and *Lange*," and (ii) the motion to dismiss should be denied except as to two (and part of a third) of the ten Counts of the Quadrant complaint. The matter was then returned to this Court, and was re-argued before us on October 23, 2013.

Section 500.27(a) of the Court of Appeals Rules of Practice authorizes certification of cases to the New York Court of Appeals "[w]henever it appears to ... a court of

---

* Sitting by designation pursuant to art. IV, § 12 of the Delaware Constitution and Delaware Supreme Court Rules 2 and 4(a) to constitute the quorum required.

1. EBF disputes that it is the ultimate parent of Athilon.

last resort of any other state that determinative questions of New York law are involved in a case pending before that court for which no controlling precedent of the Court of Appeals exists...."[2] We have concluded that a resolution of the appeal before us depends on dispositive and unsettled questions of New York law that, in our view, are properly answered in the first instance by the New York Court of Appeals. Our reasons for so concluding are set forth below.

## I. STATEMENT OF FACTS[3]

### A. Nature of the Case

Athilon, a Delaware corporation, was formed in 2004 and (through a subsidiary) sold credit derivative products—in the form of "credit default swaps"[4] covering senior tranches of collateralized debt obligations to large financial institutions. To finance those activities, Athilon raised (in addition to its initial equity capital) $600 million of debt capital consisting of $350 million in senior subordinated notes, $200 million in subordinated notes, and $50 million in junior notes (collectively, the "Notes"). The Notes are long term obligations covered by two separate indentures; one created in 2004 between Athilon and Deutsche Bank Trust Company Americas as Indenture Trustee; and the other, created in 2005 between Athilon and The Bank of New York, as Indenture Trustee. Because for present purposes the indentures are substantively identical, they are referred to singly as "the Indenture."

Athilon's organizational documents limit its permissible lines of business to selling credit default swaps, and require compliance with strict operating guidelines. Those guidelines mandate that if a "Suspension Event"[5] occurs and remains uncured, then Athilon must enter into "runoff" mode, meaning that Athilon cannot write new business and must pay off existing credit default swaps as they mature.

Before the financial crisis of 2008, Athilon underwrote over $50 billion in nominal credit default risk, but on a highly leveraged basis. Measured against Athilon's equity, Athilon's leverage ratio was a stratospheric 506:1. At that level, a 0.2% loss on the collateralized debt obligations covered by Athilon's credit default swaps would wipe out its equity cushion and render Athilon insolvent, at least on paper. Even so, the rating agencies gave Athilon "AAA/Aaa" counterparty credit ratings and investment grade debt credit ratings.

In 2008, Athilon found itself in distress and by the end of that year had lost its AAA/Aaa ratings. By 2010, Athilon had unwound two credit default swaps at a cost of approximately $370 million—more than three times Athilon's equity capital. By August 2010, Athilon no longer held any investment grade debt or counterparty credit ratings. Under its operating guidelines, Athilon entered permanent "runoff" mode.

With Athilon in distress, the trading prices of its debt securities fell precipitately. That enabled EBF to acquire a large

---

**2.** N.Y. Comp.Codes R. & Regs., tit. 22 § 500.27(a) (2013).

**3.** The facts are drawn from the allegations of the complaint filed in the Court of Chancery.

**4.** Athilon and its subsidiary are referred to collectively as "Athilon." Credit swaps are contracts in which a credit derivative product company, such as Athilon, promises to make

one or more defined payments should a specified degree of losses be sustained on a reference portfolio, as a result of defaults or other "credit events" by one or more designated obligors during a specified (typically, multiyear) period of time.

**5.** Generally, a Suspension Event involves, inter alia, capital shortfalls, leverage ratios, or insolvency.

position in the junior notes at a significant discount. In August 2010, EBF acquired control of 100% of Athilon's equity, and installed Athilon's current board of directors. Those directors, the complaint alleges, are dominated and controlled by EBF. Quadrant acquired its position in the Notes in May 2011, nine months after EBF took control.

In its complaint Quadrant alleges that as of September 30, 2011, Athilon's shareholders' equity, measured according to GAAP, stood at a negative $660 million. Quadrant alleges that Athilon is insolvent and has no prospect of returning to solvency, because it can only sell credit default swaps and because the market for that business has collapsed for enterprises, like Athilon, that hold no collateral.

At the heart of Quadrant's lawsuit is its claim that in these circumstances, a properly motivated board of directors would preserve Athilon's value for orderly liquidation in 2014, when the last credit default swap expires. The EBF board designees, however, are (according to Quadrant) pursuing strategies designed to benefit EBF and its affiliates at the expense of the remaining classes of Note holders. Specifically, the directors have caused Athilon to continue paying interest on the junior notes (which EBF holds), even though Athilon had a contractual right to defer those interest payments and those notes would receive nothing in an orderly liquidation. Athilon's directors also allegedly agreed to pay ASIA above-market fees to manage Athilon's day-to-day operations. The Court of Chancery characterized Quadrant's claim thusly:

Together, the EBF designees and ASIA have embarked on a high-risk invest-

ment strategy, contrary to the terms of Athilon's governing documents, that amounts to a "heads EBF wins, tails everyone else loses" bet. If the high-risk investments succeed, then the underwater Junior Notes and equity will benefit. If the investments fail, then the more senior tranches of Notes will bear the loss." [6]

In October 2011, Quadrant filed this Court of Chancery action against EBF and its affiliates and against Athilon and its officers and directors. As amended, the complaint contained ten Counts. For present purposes, the relevant fact is that only two of those Counts—Counts VII and VIII—and part of a third, Count X, seek to enforce rights under the Indenture.[7] The balance of Quadrant's claims for relief are based on either Delaware fiduciary or statutory law.

## B. Circumstances Out of Which The Questions of New York Law Arise

The circumstances out of which the questions of New York law arise are as follows: The basis of the defendant's motion to dismiss the complaint was (and is) that all of the claims asserted in Quadrant's complaint are barred by the no-action clause of the Indenture, which is governed by New York law. The no-action clause pertinently provides that:

No holder of any Security shall have any right by virtue or by availing of any provision of this Indenture to institute any action or proceeding at law or in equity or in bankruptcy or otherwise upon or under or with respect to this Indenture, or for the appointment of a

---

**6.** Report on Remand, Exhibit C, at p. 5.

**7.** Count VII claimed that Athilon breached the Indenture's implied covenant of good faith and fair dealing, and Count VIII assert-

ed that EBF had tortiously interfered with Athilon's obligations under the Indenture. Count X charged EBF and ASIA with civil conspiracy for actions taken in concert with the individual defendants.

trustee, receiver, liquidator, custodian or other similar official or for any other remedy hereunder, unless such holder ... [complies with specified conditions].

It is undisputed that Quadrant did not comply with the conditions set forth in the Athilon no-action clause before filing suit. In support of their motion to dismiss the complaint, the defendants relied on the two cases previously cited, *Feldbaum v. McCrory Corp.* and *Lange v. Citibank, N.A.* In those cases, the Delaware Court of Chancery, applying New York law, dismissed both actions on the ground that they were barred by the respective indenture no-action clauses. In its June 5, 2012 order (Exhibit A to this Certificate), the court granted the motion to dismiss, citing *Feldbaum* and *Lange* as "directly on point," but without engaging in any analysis.

On appeal to this Court, Quadrant argued that the no-action clauses in *Feldbaum* and *Lange* indentures were "substantially different" from the no-action clause in the Athilon Indenture. Specifically, the no-action clauses in *Feldbaum* and *Lange* barred actions to enforce not only rights arising under the respective indentures, but also "any remedy with respect to this Indenture *or the Securities*." [8] In contrast, the Athilon no-action clause bars only actions to enforce rights "upon or under or with respect *to this Indenture*." [9] Absent from the Athilon no-action clause is the phrase "or the Securities"—language that was contained in the no-action clauses in the *Feldbaum* and *Lange* indentures.

By Order dated February 12, 2013 (Exhibit B to this Certificate), this Court determined that the current record was insufficient for appellate review, and remanded the case to the Court of Chancery with instructions "to issue an opinion analyzing the significance (if any) under New York law of the differences between the no-action clauses in the *Lange* and *Feldbaum* indentures and the Athilon Indenture." The Remand Order further instructed that "[t]he analysis should include a discussion of decisions by New York courts, and other courts applying New York law, that bear on the issue presented here." This Court retained jurisdiction to consider the implications of the Report on Remand.

On June 20, 2013, the Court of Chancery issued its 55 page Report on Remand (Exhibit C to this Certificate). In that Report the Court of Chancery, after extensively analyzing the New York case law, concluded—contrary to its earlier conclusion—that:

[A]s a matter of New York law, the differences between the Athilon [no-action] [c]lause and the *Feldbaum/Lange* clause are significant.... the Athilon Clause does not apply to Counts I through VI and IX of the Complaint, or to Count X to the extent it seeks to impose liability on secondary actors for violations of the other counts. The clause applies to Counts VII and VIII of the Complaint, subject to the outcome of Quadrant's other arguments on appeal. [10]

The case was then returned to this Court, which held a supplemental oral argument on October 23, 2013, to enable the parties to argue the implications of the Report on Remand. Quadrant argued that the Report on Remand correctly decided the dispositive New York law issues, and that the order of dismissal should be modified to conform to the conclusions in that Report. The defendants, however, maintained that that Report was legally incorrect and that the Court of Chancery's

---

**8.** Italics added.

**9.** Italics added.

**10.** Exhibit C to this Certificate, at 54–55.

June 5, 2012 order of dismissal reflected the correct construction of New York law. Neither party was able to identify any decision by the New York Court of Appeals (or any lower New York court) that directly addresses, let alone disposes, of the questions of New York law this Court is being asked to decide.[11] Those questions are not controlled by precedent. Moreover, however those questions may be resolved, the answers will be determinative of the case before us. For those reasons, and because of the need for certainty in the law controlling the instruments that govern publicly traded bonds, this Court unanimously determined that the New York Court of Appeals should have the opportunity to decide those questions in the first instance.

## II. *THE QUESTIONS OF NEW YORK LAW, NOT CONTROLLED BY PRECEDENT, THAT MAY BE DETERMINATIVE*

A resolution of the appeal before us depends upon the answer to two questions of New York law that are not controlled by precedent. This Court certifies the following questions to the New York Court of Appeals:

(1) A trust indenture no-action clause expressly precludes a security holder who fails to comply with that clause's preconditions, from initiating any action or proceeding upon or under or with respect to "this Indenture," but makes no reference to actions or proceedings pertaining to "the Securities."

The question is whether, under New York law, the absence of any reference in the no-action clause to "the

Securities" precludes enforcement only of contractual claims arising under the Indenture, or whether the clause also precludes enforcement of all common law and statutory claims that security holders as a group may have.

(2) In its Report on Remand (Exhibit C), the Court of Chancery found that the Athilon no-action clause, which refers only to "this Indenture," precludes enforcement only of contractual claims arising under the Indenture. The question is whether that finding is a correct application of New York law to the Athilon no-action clause.

## III. *WHY THESE ISSUES SHOULD BE ADDRESSED BY THE COURT OF APPEALS AT THIS TIME*

In our national securities markets, the law governing many (if not most) publicly traded debt securities is a creature of New York law. Important rights and requirements pertaining to those securities are expressed in indentures that are, and for over a century have been, governed by New York law. As a consequence, New York has a very strong interest in assuring that those markets function properly. An important requirement for properly functioning public debt security markets is that the rights pertaining to those securities be certain and predictable to both investors and issuers. The New York Court of Appeals is the most authoritative tribunal empowered to adjudicate definitively the rights and requirements contained in indentures governed by New York law. For that reason, and because New York has the stronger interest in this issue, in con-

---

11. *Gen. Inv. Co. v. Interborough Rapid Transit Co.*, 200 A.D. 794, 193 N.Y.S. 903 (1922) *aff'd*, 235 N.Y. 133, 139 N.E. 216 (1923), which was decided before the adoption of the Trust Indenture Act, addressed whether a no-action clause with no reference to "the Securities" precluded a security holder's action to collect outstanding principal and interest due under the securities.

trast to that of Delaware, it is appropriate that the Court of Appeals be afforded the opportunity to adjudicate the certified issues in the first instance.

Moreover, the certified questions, which test the boundaries of a no-action clause's coverage, are most frequently raised in actions asserting non-contractual claims that arise under the law of the issuer's state of organization. As a consequence, those questions are often decided by non-New York courts—as evidenced by the Delaware cases interpreting the no-action clauses contained in New York bond contracts. Because the certified questions have not been raised directly before New York courts (as the dearth of case law suggests)—but are raised frequently before courts in sister states—it is particularly important that the New York Court of Appeals give guidance to those latter courts by addressing these questions on certification at this time.

\* \* \*

We direct the Clerk of this Court to send this opinion to the Clerk of the New York Court of Appeals, as our certificate, together with the parties' briefs and appendices. We will take no further action in this appeal until after the New York Court of Appeals acts on this certification request.

## EXHIBIT A

### IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

QUADRANT STRUCTURED PRODUCTS COMPANY, LTD., Individually and Derivatively on Behalf of Athilon Capital Corp., Plaintiff,

v.

VINCENT VERTIN, MICHAEL SULLIVAN, PATRICK B. GONZALES, BRANDON JUNDT, J. ERIC WAGONER, ATHILON CAPITAL CORP., ATHILON STRUCTURED INVESTMENTS AD-

VISORS LLC, and EBF & ASSOCIATES, LP, Defendants.

C.A. No. 6990–VCL

### ORDER GRANTING MOTION TO DISMISS

WHEREAS the defendants have moved dismiss the complaint, the Court has reviewed the motions and related briefing and authorities, and oral argument is unnecessary in light of this Court's precedents,

IT IS HEREBY ORDERED this 5th day of June, 2012, that

1. The complaint is DISMISSED in Light of the plaintiff's failure to comply with the no-action clauses in the indentures governing the debt instruments that the plaintiff holds. *See Lange v. Citibank, N.A.,* 2002 WL 2005728, 2002 Del. Ch. Lexis 101 (Aug. 13, 2002); *Feldbaum v. McCrory Corp.,* 1992 WL 119095, 1992 Del. Ch. Lexis 113 (June 1, 1992) (Allen, C.). The decisions in *Lange* and *Feldbaum* are directly on point.

2. The Court has not reached any of the other grounds asserted for dismissal.

/s/ Vice Chancellor Laster
Vice Chancellor Laster

### EXHIBIT B

### IN THE SUPREME COURT OF THE STATE OF DELAWARE

QUADRANT STRUCTURED PRODUCTS CO., LTD., Individually and Derivatively on behalf of Athilon Capital Corp., Plaintiff Below, Appellant,

v.

VINCENT VERTIN, MICHAEL SULLIVAN, PATRICK B. GONZALEZ, BRANDON JUNDT, J. ERIC WAGONER, ATHILON CAPITAL CORP., ATHILON STRUCTURED INVESTMENT ADVIS-

ORS LLC, EBF & ASSOCIATES, LP, Defendants Below, Appellees.

No. 338, 2012

Court Below: Court of Chancery of the State of Delaware

C.A. No. 6990 VCL

Submitted: Feb. 5, 2013

Decided: Feb. 12, 2013

Before **STEELE**, Chief Justice, **HOLLAND, BERGER, JACOBS** and **RIDGELY**, Justices, constituting the *Court en Banc.*

### ORDER

This 12th day of February 2013, upon consideration of the briefs of the parties, and their contentions in oral argument, it appears to the Court that:

1. Quadrant Structured Products Co., Ltd., the plaintiff-below ("Quadrant"), appeals from a Court of Chancery order granting a motion to dismiss by the defendants, who are Athilon Capital Corp. ("Athilon"), Athilon's officers and directors, EBF & Associates, LP ("EBF"), and Athilon Structured Investment Advisors LLC ("ASIA") (collectively, "defendants"). We conclude that the current record is insufficient for appellate review. Accordingly, the case must be remanded to the Court of Chancery to issue an opinion stating its reasons for concluding that Quadrant's claims are barred by the no-action clause in the indenture governing the Athilon securities that Quadrant holds.

2. In October 2011, Quadrant, a holder of Athilon debt securities, brought this action asserting claims against Athilon and its·officers and directors, and against EBF (a partnership that indirectly controls Athilon) and ASIA (an EBF affiliate that manages Athilon on a day-to-day basis). On June 5, 2012, based solely on the parties' briefs, the Court of Chancery granted the defendants' motion to dismiss Quadrant's Amended Complaint.[1]

3. The order dismissing the Amended Complaint consists of two short paragraphs which conclude that dismissal was warranted "in light of the plaintiff's failure to comply with the no-action clauses in the indentures governing the debt instruments that the plaintiff holds."[2] The order cited, as "directly on point,"[3] two Court of Chancery opinions decided under New York law, *Lange v. Citibank, N.A.*[4] and *Feldbaum v. McCrory Corp.*[5] No reasons were stated to support the conclusion that those cases were directly on point. This appeal followed.

4. This Court reviews *de novo* a trial court's grant of a motion to dismiss.[6] On appeal, Quadrant claims that *Lange* and *Feldbaum* are not controlling, because the no-action indenture clause in those cases were critically different from the no-action clause in the Athilon indenture at issue here ("Athilon Indenture"). Therefore, Quadrant argues, by concluding that the Athilon no-action clause barred this lawsuit, the Court of Chancery erred as a matter of law.

1. *Quadrant v. Vertin*, C.A. 6990–VCL, slip op. (Del. Ch. June 5, 2012) (Laster, V.C.).

2. *Id.*

3. *Id.*

4. 2002 Del. Ch. LEXIS 101, 2002 WL 2005728 (Del.Ch. Aug. 13, 2002).

5. 1992 Del. Ch. LEXIS 113, 1992 WL 119095 (Del.Ch. June 1, 1992).

6. *Account v. Hilton Hotels Corp.*, 780 A.2d 245, 248 (Del.2001).

5. In *Feldbaum*, the Court of Chancery, applying New York law, held that a no-action clause in an indenture constituted a waiver by the bondholder-plaintiffs of their right to prosecute an action against the debtor-defendants without first satisfying the conditions prescribed by the no-action clause.[7] The *Feldbaum* indenture provided that "[a] Securityholder may not pursue any remedy with respect to this Indenture *or the Securities*" unless certain conditions were first satisfied.[8] Because the bondholder-plaintiffs had not complied with those conditions, the court dismissed the claims covered by the indenture's no-action clause.[9]

6. In *Lange*, the Court of Chancery granted the defendants' motion for judgment on the pleadings, similarly because the plaintiffs, a group of debenture holders, had failed to comply with a no-action clause in the applicable indenture, which also was governed by New York law.[10] The no-action clause, which contained language identical to that in *Feldbaum*, provided that "[a] Securityholder may not pursue a remedy with respect to this Indenture *or the Securities*" unless the debenture holder first satisfied certain conditions.[11]

7. In this case, the Athilon Indenture, which is also governed by New York law, is worded differently from the indentures at issue in *Lange* and *Feldbaum*. The Athilon Indenture provides that "[n]o hold-er of any Security shall have any right by virtue or by availing of any provision of this Indenture to institute any action or proceeding at law or in equity or in bankruptcy or otherwise *upon or under or with respect to this Indenture,*" unless certain conditions are first satisfied.[12] Unlike the no-action clauses in *Lange* and *Feldbaum*, the no-action clause in the Athilon Indenture does not contain the phrase "or the Securities."[13] The absence of that phrase, Quadrant argues, critically distinguishes *Lange* and *Feldbaum* and renders them noncontrolling. That argument presents a litigable issue that merits analysis by the Court of Chancery in the first instance.

8. The Court of Chancery order of dismissal did not address the differences between the respective no-action clauses in the *Lange* and *Feldbaum* indentures and the Athilon Indenture. Presumably the court found those differences to be not legally significant, but the order does not explain why. Nor does the order cite to, or discuss, applicable New York case law that would support the court's implicit view that the New York courts would find those differences legally insignificant.[14] For these reasons, and at this juncture, the record does not adequately lend itself to informed appellate review.

9. Accordingly, we remand this action to the Court of Chancery to issue an opinion analyzing the significance (if any) under New York law of the differences be-

---

7. *Feldbaum*, 1992 WL 119095, at *5, *7–8.

8. *Id.* (italics added).

9. *Id.* at *3.

10. 2002 WL 2005728, at *6.

11. *Id.* at *5–6 (italics added).

12. App. to Appellant's Op. Br. at A–229 (emphasis added) (§ 7.06 of the Indenture).

13. *Id.*

14. Both *Lange* and *Feldbaum* cited federal and New York cases concerning the interpretation of no-action clauses in contracts and indentures governed by New York law. In this case, the Court of Chancery order did not cite, or discuss the applicability of those decisions or any other New York cases decided after *Feldbaum* and *Lange*.

tween the no-action clauses in the *Lange* and *Feldbaum* indentures and the Athilon Indenture. The analysis should include a discussion of decisions by New York courts, and other courts applying New York law, that bear on the issue presented here.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Court of Chancery is **REMANDED** for further proceedings in accordance with this Order. Jurisdiction is retained.

BY THE COURT:

/s/ Jack B. Jacobs

Justice

## EXHIBIT C

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

QUADRANT STRUCTURED PRODUCTS COMPANY, LTD., Individually and Derivatively on Behalf of Athilon Capital Corp., Plaintiff,

v.

VINCENT VERTIN, MICHAEL SULLIVAN, PATRICK B. GONZALEZ, BRANDON JUNDT, J. ERIC WAGONER, ATHILON CAPITAL CORP., ATHILON STRUCTURED INVESTMENT ADVISORS LLC, and EBF & ASSOCIATES, LP, Defendants.

C.A. No. 6990–VCL

### REPORT PURSUANT TO DELAWARE SUPREME COURT RULE 19(c)

Date Submitted: March 22, 2013

Date Decided: June 20, 2013

Lisa A. Schmidt, Catherine G. Dearlove, Russell C. Silberglied, Cory D. Kandestin, Robert L. Burns, Susan M. Hannigan, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Harold S. Horwich, P. Sabin Willett, Samuel R. Rowley, BINGHAM McCUTCHEN LLP, Boston, Massachusetts; *Attorneys for Plaintiff Quadrant Structured Products Company, Ltd.*

Philip A. Rovner, Jonathan A. Choa, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Philippe Z. Selendy, Nicholas F. Joseph, Sean P. Baldwin, QUINN EMANUEL URQUHART & SULLIVAN, LLP; New York, New York; *Attorneys for Defendants Vincent Vertin, Michael Sullivan, Patrick B. Gonzalez, Brandon Jundt, J. Eric Wagoner, Athilon Capital Corp., and Athilon Structured Investment Advisors LLC.*

Collins J. Seitz, Jr., Garrett B. Moritz, Eric D. Selden, SEITZ ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; *Attorneys for Defendant EBF & Associates, LP.*

**LASTER, Vice Chancellor.**

Plaintiff Quadrant Structured Products Company, Ltd. ("Quadrant") owns notes issued by defendant Athilon Capital Corp. ("Athilon"). Before filing this lawsuit, Quadrant did not comply with the no-action clauses in the indentures governing its notes. The defendants moved to dismiss on that basis, and Quadrant responded with arguments that this Court rejected in *Feldbaum v. McCrory Corp.*, 1992 WL 119095 (Del.Ch. June 1, 1992), and *Lange v. Citibank, N.A.*, 2002 WL 2005728 (Del. Ch. Aug.13, 2002). At the time, Quadrant did not distinguish the language of the Athilon no-action clause from the clause at issue in *Feldbaum* and *Lange*. I granted the motion, observing that *Feldbaum* and *Lange* were "directly on point."

On appeal, Quadrant argued that the Athilon clause differs critically from the *Feldbaum/Lange* clause because the former refers only to claims under the indenture, but the latter referred to both the indenture and the notes. By order dated

February 12, 2013, the Delaware Supreme Court directed me "to issue an opinion analyzing the significance (if any) under New York law of the differences between the no-action clauses."

For the reasons set forth herein, Quadrant has persuaded me that the language of the Athilon no-action clause distinguishes this case from *Feldbaum* and *Lange.* Had Quadrant previously made this argument, I would have relied on the no-action clause to dismiss only Counts VII–VIII and part of Count X, and then reached the defendants' other grounds for dismissing the remaining counts.

## I. FACTUAL BACKGROUND

The facts are drawn from Quadrant's verified amended complaint (the "Complaint" or "CC") and the documents it incorporates by reference, including (i) an indenture dated as of December 21, 2004, between Athilon and Deutsche Bank Trust Company Americas, as Trustee, governing the Subordinated Deferrable Interest Notes, Series A and B, and (ii) an indenture dated as of July 26, 2005, between Athilon and The Bank of New York, as Trustee, governing the Senior Subordinated Deferrable Interest Notes, Series A, B, C and D. For present purposes, the indentures are substantively identical, so I refer to them singly as the "Indenture." Quotations are from the 2004 indenture.

### A. Athilon's Corporate Structure And Business Model

Athilon is a Delaware corporation with its principal place of business in New York, New York. Athilon and its wholly owned subsidiary, Athilon Asset Acceptance Corp. (jointly, the "Companies"), were formed in 2004 to sell credit default swaps to financial institutions. Through its subsidiary, Athilon wrote credit default swaps covering senior tranches of collater-alized debt obligations. At the parent level, Athilon guaranteed the swaps.

Athilon was financed originally with $100 million of equity capital. It raised another $600 million of debt capital, comprising $350 million in senior subordinated notes, $200 million in subordinated notes, and $50 million in junior notes (collectively, the "Notes"). The Notes are long-term obligations that will mature, depending upon the series, in 2035, 2045, or 2047. Interest payments on the Notes are deferrable for up to five years at Athilon's option. All of the Notes rank in priority below Athilon's credit default swap obligations.

The Companies' organizational documents limit their permissible lines of business to selling credit default swaps and require compliance with strict operating guidelines. The Companies only can invest in high quality securities of short duration, and their portfolios must be sufficient at all times to cover any credit default swaps and the Notes. The guidelines mandate that if a "Suspension Event" occurs and remains uncured, then the Companies must enter "runoff" mode. When in that status, the Companies cannot write new business and must pay off existing credit default swaps as they mature.

### B. The Business Model Fails.

Before the financial crisis of 2008, market participants discounted the risks faced by credit derivative product companies, enabling Athilon to underwrite over $50 billion in nominal credit default risk. Measured against its $700 million in committed capital, Athilon operated with a vertiginous leverage ratio of 71:1. Measured against Athilon's equity, Athilon's leverage ratio was a stratospheric 506:1. At that level, a 0.2% loss on the collateralized debt obligations covered by Athilon's credit default swaps would wipe out its equity cushion

and render Athilon insolvent, at least on paper. The rating agencies gave the Companies "AAA/Aaa" debt ratings and investment grade counterparty credit ratings.

In 2008, the Companies found themselves in distress, and they lost their AAA/Aaa ratings at the end of that year. By early 2009, the Companies had sustained several Suspension Events. In 2010, Athilon unwound two credit default swaps at a cost of $370 million, more than three times its equity capital. By August, the Companies no longer held any investment grade debt or counterparty credit ratings. Under the operating guidelines, the Companies entered permanent runoff mode.

## C. The EBF Takeover

With Athilon in distress, the trading prices of its debt securities fell precipitously. EBF & Associates, LP ("EBF") seized the opportunity to purchase a large position in the riskiest tranche of Notes (the "Junior Notes") at a significant discount. In August 2010, EBF acquired 100% of Athilon's equity. EBF installed the current board of directors, which the Complaint alleges is dominated and controlled by EBF. In May 2011, nine months after EBF took control, Quadrant acquired its position in the Notes.

Quadrant alleges that Athilon is insolvent. Excluding its outstanding credit default swaps, Athilon continues to carry $600 million of debt, but its assets allegedly have a fair market value of only $426 million. As of September 30, 2011, Athilon's shareholder's equity, measured according to GAAP, stood at negative $660 million. The Complaint alleges that Athilon has no prospect of returning to solvency because it can only sell credit default swaps, and the market for that business has collapsed.

Quadrant argues that under the circumstances, a properly motivated board of di-

rectors would preserve Athilon's value for orderly liquidation in 2014, when the last credit default swap expires. The EBF designees on the Athilon board, by contrast, are pursuing strategies designed to benefit EBF and its affiliates. They have caused Athilon to continue paying interest on the Junior Notes, notwithstanding the right to defer those payments and the fact that the Junior Notes would receive nothing in an orderly liquidation. They also agreed to pay Athilon Structured Investment Advisors LLC ("ASIA"), an EBF affiliate, above-market service fees to manage Athilon's day-to-day operations. Together, the EBF designees and ASIA have embarked on a high-risk investment strategy, contrary to the terms of Athilon's governing documents, that amounts to a "heads EBF wins, tails everyone else loses" bet. If the high-risk investments succeed, then the underwater Junior Notes and equity will benefit. If the investments fail, then the more senior tranches of Notes will bear the loss.

## D. The Quadrant Complaint

In October 2011, Quadrant filed suit against Athilon, its officers and directors, EBF, and ASIA. As amended, the Complaint contained ten counts:

- Count I asserted a derivative claim on behalf of Athilon against the individual defendants for breaching their fiduciary duties by (i) continuing to pay interest on the Junior Notes; (ii) paying above-market service and license fees to EBF; (iii) departing from an appropriately conservative capital investment strategy; and (iv) causing Athilon to violate its organizational documents and operating guidelines.
- Count II asserted a derivative claim against EBF for aiding and abetting the breaches of fiduciary duty alleged in Count I.

- Count III sought a permanent injunction barring the individual defendants from causing Athilon to pay the interest and fees identified in Count I.
- Counts IV and V challenged the payment of interest and fees under the Delaware Fraudulent Transfer Act ("DFTA").
- Count VI sought a permanent injunction under the DFTA against the continuing payment of interest and fees.
- Count VII contended that by taking the actions detailed in Count I and elsewhere in the complaint, Athilon breached the implied covenant of good faith and fair dealing that inheres in the Indenture.
- Count VIII asserted that EBF had tortiously interfered with Athilon's obligations under the Indenture.
- Count IX asserted that Athilon paid constructive dividends in violation of Delaware law and sought to recover those payments from the individual defendants.
- Count X asserted a claim for civil conspiracy against EBF and ASIA for actions taken in concert with the individual defendants.

Quadrant brought Counts I–III derivatively in its capacity as a creditor of an insolvent corporation. Quadrant brought Counts IV–VIII directly in its capacity as a creditor. Quadrant brought Counts IX and X both directly and derivatively. In Counts I–VI and IX, Quadrant relied solely on its status as a holder of the Notes. In Counts VII and VIII, Quadrant relied on the Indenture. In seeking to impose secondary liability under Count X, Quadrant relied on the Notes and the Indenture to the same degree as the related primary counts.

The defendants moved to dismiss the Complaint on a variety of substantive and procedural grounds. In their lead argument, the defendants invoked the no-action clause in the Indenture, which states:

*Limitations on Suits by Securityholder.* No holder of any Security shall have any right by virtue or by availing of any provision of this Indenture to institute any action or proceeding at law or in equity or in bankruptcy or otherwise upon or under or with respect to this Indenture, or for the appointment of a trustee, receiver, liquidator, custodian or other similar official or for any other remedy hereunder, unless such holder previously shall have given to the Trustee written notice of default in respect of the series of Securities held by such Securityholder and of the continuance thereof, as hereinbefore provided, and unless also the holders of not less than 50% of the aggregate principal amount of the relevant series of Securities at the time Outstanding shall have made written request upon the Trustee to institute such action or proceedings in its own name as trustee hereunder and shall have offered to the Trustee such reasonable indemnity as it may require against the costs, expenses and liabilities to be incurred therein or thereby and the Trustee for 60 days after its receipt of such notice, request and offer of indemnity shall have failed to institute any such action or proceedings and no direction inconsistent with such written request shall have been given to the Trustee pursuant to Section 7.08 hereof within such 60 days. . . .

Dkt. 32 Ex. A. § 7.06 at 51–52 (the "Athilon Clause"). Quadrant admittedly did not comply with the Athilon Clause before filing suit. Relying on *Feldbaum, Lange,* and their progeny, the defendants pointed out that no-action clauses have resulted in pleadings-stage dismissals of precisely the types of claims that Quadrant asserted.

To avoid the Athilon Clause, Quadrant argued that it governs "only those suits that arise from a default" and not other types of claims. Ans. Br. at 10. Quadrant also argued that to enforce the Athilon Clause "would operate to ban (not merely channel through a particular plaintiff) a range of personal noteholder claims that spring from the law of fiduciary duties, fraudulent transfer, securities, and other sources of law, none of which requires a note default as a prerequisite to suit," thereby converting the Athilon Clause into a covert release of claims and leaving noteholders without a remedy. *Id.* at 13. Quadrant likewise contended that the Athilon Clause applied only to suits *against* the issuer and not to derivative actions brought by creditors on the issuer's behalf. *Id.* at 15. In its only response to *Feldbaum*, Quadrant asserted that under that decision, a no-action clause would bar a noteholder suit only "so long as 'the trustee is capable of satisfying its obligations.'" *Id.* at 10 (quoting *Feldbaum*, 1992 WL 119095, at *6). According to Quadrant, the trustee could not fulfill its obligations because the trustee only could sue following an "Event of Default," and no "Event of Default" had yet occurred. *Id.* at 10–11. Quadrant did not contend that the language of the Athilon Clause differed meaningfully from the language of the clause at issue in *Feldbaum* and *Lange*.

After reviewing the briefing and the authorities cited by the parties, I concluded that *Feldbaum* and *Lange* addressed the points Quadrant had raised. By order dated June 5, 2012, I dismissed the action with prejudice, observing that *Feldbaum* and *Lange* were "directly on point." Dkt. 60 (the "Dismissal Order").

## E. The Appeal

Quadrant appealed. Before the Delaware Supreme Court, Quadrant reiterated the arguments rejected in *Feldbaum* and *Lange*, noting that both were Court of Chancery decisions and that the issues presented questions of first impression for the high court. *See* Appellant's Op. Br. at 1. Quadrant also argued for the first time that *Feldbaum* and *Lange* "construed substantially different contracts" and that the Athilon Clause applied "only to claims that arise from the governing indenture itself." *Id.* at 2. In support of this new contention, Quadrant observed that the *Feldbaum/Lange* clause "applied not only to rights under its indenture, but also to 'any remedy with respect to ... the Securities.'" *Id.* at 16–17 (quoting *Feldbaum*, 1992 WL 119095, at *5–6; citing *Lange*, 2002 WL 2005728, at *5). Quadrant also relied on *Victor v. Riklis*, 1992 WL 122911 (S.D.N.Y. May 15, 1992), as giving dispositive meaning to the absence of the phrase "or the Securities." Appellant's Op. Br. at 19–20. Quadrant had not cited *Victor* before this Court.

By order dated February 12, 2013, the Delaware Supreme Court determined that "the current record is insufficient for appellate review." *Quadrant Structured Prods. Co. v. Vertin*, No. 388, 2012, ¶ 1 (Del. Feb. 12, 2013) (the "Remand Order"). The Delaware Supreme Court explained that "[o]n appeal, Quadrant claims that *Lange* and *Feldbaum* are not controlling, because the no-action indenture clause in those cases were [sic] critically different from the no-action clause in the Athilon indenture at issue here." *Id.* ¶ 4. The high court observed that the no-action clauses in both *Lange* and *Feldbaum* provided that "[a] Securityholder may not pursue a remedy with respect to this Indenture *or the Securities*" without satisfying the conditions set forth in the clause. *Id.* ¶ 5

(quoting *Feldbaum,* 1992 WL 119095, at *5 (emphasis in original)), ¶ 6 (quoting *Lange,* 2002 WL 2005728, at *5 (emphasis in original)). The Delaware Supreme Court observed that the Athilon Clause "is worded differently from the indentures at issue in *Lange* and *Feldbaum*" and that "[u]nlike the no-action clauses in *Lange* and *Feldbaum,* the no-action clause in the Athilon Indenture does not contain the phrase 'or the Securities.'" *Id.* ¶ 7. The Delaware Supreme Court remanded the case to this Court with instructions "to issue an opinion analyzing the significance (if any) under New York law of the differences between the no-action clauses in the *Lange* and *Feldbaum* indentures and the Athilon indentures." *Id.* ¶ 9. The Remand Order stressed that "[t]he analysis should include a discussion of decisions by New York courts, and other courts applying New York law, that bear on the issue presented here." *Id.* The Remand Order did not instruct this Court to address any of the other arguments raised by Quadrant on appeal. Pursuant to Supreme Court Rule 19(c), the Delaware Supreme Court retained jurisdiction to consider the implications of this Court's report.

## II. LEGAL ANALYSIS

In accordance with the Remand Order, this opinion first considers the plain language of the Athilon Clause and the *Feldbaum/Lange* clause. It then reviews (i) authorities that have construed no-action clauses under New York law, (ii) other instructive Delaware precedents, and (iii) authoritative commentary. Because the linguistic distinction that Quadrant raised on appeal appears to have analytical heft, the opinion concludes by applying the language of the Athilon Clause to the ten counts in the Complaint.

### A. The Plain Language Of The Clauses

"[U]nder New York law interpretation of indenture provisions is a matter of basic contract law." *U.S. Bank Nat'l Ass'n v. U.S. Timberlands Klamath Falls, L.L.C.,* 2004 WL 1699057, at *2 (Del.Ch. July 29, 2004) (internal quotation marks omitted). "The best evidence of what parties to a written agreement intend is what they say in their writing. Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Records, Inc.,* 98 N.Y.2d 562, 750 N.Y.S.2d 565, 780 N.E.2d 166, 170 (2002) (citation and internal quotation marks omitted).

For purposes of plain language analysis, the Athilon Clause can be parsed as follows:

No holder of any Security

1.0 shall have any right by virtue or by availing of any provision of this Indenture

2.0. to institute any action or proceeding at law or in equity or in bankruptcy or otherwise

3.0 upon or under or with respect to this Indenture, or

4.0 for the appointment of a trustee, receiver, liquidator, custodian or other similar official or for any other remedy hereunder,

unless [the holder complies with specified conditions].

*See* Dkt. 32 Ex. A. § 7.06 at 51–52. The *Feldbaum/Lange* clause used different language: "A Securityholder may not pursue any remedy with respect to this Indenture or the Securities unless [the Securityholder complies with specified conditions]." *Feldbaum,* 1992 WL 119095, at *5; *accord Lange,* 2002 WL 2005728, at *5 ("A Securityholder may not pursue a remedy with respect to this Indenture or the Securities

unless [the Securityholder complies with specified conditions].")". The operative question posed by the Remand Order is whether subparts 1.0 through 4.0 of the Athilon Clause give it a different scope than the simpler language of the *Feldbaum/Lange* clause.

Subpart 1.0 of the Athilon Clause defines the sources of rights governed by the clause. Under this subpart, no "holder of any Security shall have any right by virtue or by availing of any provision of this Indenture." As a matter of plain language, the Athilon Clause does not speak to other rights that the holder of a Security may have, such as rights under or by virtue of the Security itself. It likewise does not address rights that might exist under the common law, state statutes, or federal statutory schemes like civil RICO or the federal securities laws. The *Feldbaum/Lange* clause does not contain language resembling subpart 1.0 and is not limited to any subset of potential rights. It applies to any right that any Securityholder might have, regardless of its source, to the extent the Securityholder invokes it to "pursue any remedy with respect to this Indenture or the Securities." In this respect, the Athilon Clause is narrower than the *Feldbaum/Lange* clause.

Subpart 2.0 of the Athilon Clause identifies the types of actions or proceedings that would fall within the clause if the "holder of any Security" asserted a right "by virtue or by availing of any provision of this Indenture." This aspect of the Athilon Clause encompasses "any action or proceeding at law or in equity or in bankruptcy or otherwise" that falls within the scope of the clause. The *Feldbaum/Lange* clause does not contain language resembling subpart 2.0. Just as the *Feldbaum/Lange* clause is not limited to any subset of potential rights, it is not limited to any particular type of action or proceed-

ing. It rather applies to any action or proceeding that any Securityholder might bring to the extent the Securityholder "seeks to pursue any remedy with respect to this Indenture or the Securities." Along this dimension, given the broad language of the Athilon Clause, the two provisions appear equivalent.

Subparts 3.0 and 4.0 of the Athilon Clause impose additional limitations on its scope. As noted, under subparts 1.0 and 2.0, the Athilon Clause extends to any "action or proceeding" in which the plaintiff asserts a "right by virtue or by availing of any provision of this Indenture." Under subparts 3.0 and 4.0, the "action or proceeding" also must be one in which the plaintiff (i) sues "upon or with respect to this Indenture" (3.0) or (ii) seeks as a remedy "the appointment of a trustee, receiver, liquidator, custodian or other similar official or for any other remedy hereunder" (4.0). As a matter of plain language, the Athilon Clause only applies to actions or proceedings involving certain types of claims (those "upon or under or with respect to this Indenture") or those seeking certain types of remedies ("the appointment of a trustee, receiver, liquidator, custodian or other similar official or for any other remedy hereunder"). The plain language of the term "hereunder" refers to the Indenture, which appears in both the immediately preceding subpart (3.0) and in the first subpart (1.0). The *Feldbaum/Lange* clause does not contain any language limiting the types of claims a Securityholder might bring, nor does it call out specific remedies. Rather, it applies broadly to any action or proceeding to the extent that a Securityholder "seeks to pursue any remedy with respect to this Indenture or the Securities." Here too, the Athilon Clause is narrower than the *Feldbaum/Lange* clause.

■                    ■

As a matter of plain language, the differences between the Athilon Clause and the *Feldbaum/Lange* clause appear significant. The Athilon Clause applies only when the holder of a Security asserts "any right by virtue or by availing of any provision of this Indenture" and only to an "action or proceeding" in which the holder sues "upon or under or with respect to this Indenture," seeks a particular remedy available under the Indenture, or otherwise seeks "appointment of a trustee, receiver, liquidator, custodian or other similar official." The *Feldbaum/Lange* clause applies broadly to any action or proceeding that any Securityholder might bring to the extent that the Securityholder "seeks to pursue any remedy with respect to this Indenture or the Securities." Under the *Feldbaum/Lange* clause, it does not matter what source of rights the Securityholder invokes or the nature of the claim that the Securityholder asserts.

## B. Cases Addressing Athilon Clauses Under New York Law

The Remand Order calls for "a discussion of decisions by New York courts, and other courts applying New York law, that bear on the issue presented here." Remand Order ¶ 9. New York courts have been interpreting no-action clauses for over one hundred years.[1] Under New York law, no-action clauses are "strictly construed."[2] New York decisions indicate that the specific language of the no-action ·clause matters and that a no-action clause will not encompass causes of action, theories, or remedies that do not fall within its terms.

Before the adoption of the Trust Indenture Act of 1939 (the "TIA"), New York courts frequently considered whether a no-action clause in an indenture could restrict a bondholder from seeking to recover on the bond for past due payments of principal and interest.[3] New York courts consistently held that absent contractual lan-

1. *See, e.g., McClelland v. Norfolk S. R.R. Co.,* 110 N.Y. 469, 18 N.E. 237, 241 (1888); *Rothschild v. Rio Grande W. Ry. Co.,* 32 N.Y.S. 37, 39–40 (Sup.Ct.1895). Two American Law Report annotations collect and summarize no-action clause cases, including numerous New York decisions. *See* C.T. Foster, *Validity, construction, and application of express restrictions on right of action by individual holder of one or more of a series of corporate bonds or other obligations,* 174 A.L.R. 435 (1948 & Supp.) (including updates through current day); P.V. Smith, *Validity, construction, and application of express restrictions on right of action by individual holder of one or more of a series of corporate bonds or other obligations,* 108 A.L.R. 88 (1937 & Supp.) (including updates through 1948).

2. *McMahan & Co. v. Wherehouse Entm't, Inc.,* 65 F.3d 1044, 1050 (2d Cir.1995); *accord Cruden v. Bank of N.Y.,* 957 F.2d 961, 968 (2d Cir.1992) ("*Cruden II* "); *Metro W. Asset Mgmt., LLC v. Magnus Funding, Ltd.,* 2004 WL 1444868, at *5 (S.D.N.Y. June 25, 2004);

*UPIC & Co. v. Kinder–Care Learning Ctrs., Inc.,* 793 F.Supp. 448, 454 (S.D.N.Y.1992); *see also Revised Model Simplified Indenture,* 55 Bus. Law. 1115, 1191 (2000) ("No action clauses are strictly construed against the issuer.").

3. The issue rarely arises today, because Section 316(b) of the TIA establishes that the holder of a note governed by the act has an absolute and unconditional right to sue on the note for past due payments of principal and interest. *See* 15 U.S.C. § 77ppp(b). Since the passage of the TIA, even those indentures not covered by the act typically contain language paralleling Section 316(b). *See generally* American Bar Association, *Commentaries on Model Debenture Indenture Provisions 1965, Model Debenture Indenture Provisions All Registered Issues 1967, and Certain Negotiable Provisions* 233–34 (1971) [hereinafter *Commentaries* ]; Churchill Rodgers, *The Corporate Trust Indenture Project,* 20 Bus. Law. 551, 563, 565–66 (1965).

guage to the contrary, the holder of a debt instrument enjoyed creditors' rights derived from the debt instrument (whether labeled "bonds," "notes," or "debentures") distinct from the trustee's rights against the underlying collateral derived from the security instrument (whether labeled an "indenture," "mortgage," or "deed of trust"). As in the current case, the no-action clause almost invariably appeared in the security instrument and not in the debt instrument.

Anyone who has purchased a home using traditional bank financing will recognize the distinction between a debt instrument and the security instrument: the borrower signs a debt instrument in the form of a promissory note reflecting the debt, and the borrower separately executes a mortgage that secures the debt by creating a lien against the home. *See* 1 *Mortgages and Mortgage Foreclosure in N.Y.* § 4:8 (2012) ("[A] corporation bond is a promise to pay, exactly as is the mortgage bond signed by the individual homeowner; the mortgage securing it is a securing lien on designated property in exactly the manner of the mortgaged homestead."). If the borrower defaults, the bank can proceed *in rem* by foreclosing on the mortgage, sue the borrower *in personam* on the promissory note, or both. *See, e.g., Manley v. MAS Assocs., LLC,* 968 A.2d 492 (Del.2009) (TABLE) (dual *in personam* and *in rem* proceeding); *Wells Fargo Bank, N.A. v. Williford,* 2011 WL 5822630, at *3 (Del.Super. Nov. 17, 2011) (*in rem* proceeding); Louis S. Posner, *The Trustee and the Trust Indenture: A Further Study,* 46 Yale L.J. 737, 768 (1937) ("[B]onds and mortgages, though evidencing but one debt, nevertheless constitute two distinct promises giving rise to two separate causes of action, [such that] the trustee, whose legal relations are held confined to the mortgage,

has no enforceable rights at law on the indebtedness").

Nineteenth century lawyers used the traditional real estate mortgage as a model when their corporate clients needed to raise long-term debt to fund major infrastructure projects like canals and railroads. *See Commentaries, supra* note 3 at 4. "The adaptation of the traditional real estate mortgage to this purpose was a work of marvelous ingenuity and a development of the greatest significance in the economic growth of the United States." *Id.* at 5. A further practical problem for publicly traded debt was the need to

> afford bondholders the benefits of a mortgage lien on the assets and yet provide in an orderly fashion for a multiplicity of bondholders holding ... securities, subject to change of ownership through trading in the bonds. The answer was found in the conveyance of the real estate and other mortgageable assets of the corporation to a trustee for the benefit of all bondholders.

*Id.; see* 1 Ralph A. McClelland & Frederick S. Fisher, Jr., *The Law of Corporate Mortgage Bond Issues In Conjunction With A Typical Indenture Of Mortgage And Deed Of Trust Securing Bonds* 2 (1937) [hereinafter *Bond Issues* ] ("The use of trustees to take and hold the mortgaged property as security for the benefit of the bondholders affords a device for unified action which otherwise would be impossible, especially since the holders of the bonds are numerous and of changing identity."). Over time, a true corporate mortgage that recorded a lien on real property "was found to be awkward if not impossible for many types of corporate borrowers," and it was "dispensable in many cases if adequate contractual protections were included in the debt instrument or the related indenture." *Commentaries, supra* note 3 at 6. "The solution was to

take the corporate mortgage indenture form, delete the conveyancing and other provisions relating to the collateral, and insert covenants designed to protect the debentureholders.... Other provisions of an administrative nature remained much the same in a debenture instrument as those in a mortgage indenture." *Id.* at 7. The result was the now-familiar bond/indenture structure at issue in this case.

Because of the distinction between debt instruments and security instruments, New York courts held that if the bond did not contain language making it subject to the indenture or sufficiently incorporating the terms of the indenture by reference, then the creditor could sue freely on the bond.[4] More importantly for present pur-

**4.** *See, e.g., Enoch v. Brandon,* 249 N.Y. 263, 164 N.E. 45, 47 (1928) (holding that references in bond to aspects of indenture "all have to do with the trust mortgage. They refer to the rights conferred by it upon the bondholders and limit and explain those rights. They are so linked together as to indicate that the obligor was speaking solely of the security."); *Cunningham v. Pressed Steel Car Co.,* 238 A.D. 624, 265 N.Y.S. 256, 259 (1933) ("We do not find that the reference to the indenture constitutes a bar to the maintenance of this action [on the bonds]."), *aff'd,* 263 N.Y. 671, 189 N.E. 750 (1934); *Lubin v. Pressed Steel Car Co.,* 146 Misc. 462, 263 N.Y.S. 433, 436–37 (City Ct.1933) (holding that where bonds referred generally to the indenture for the "rights of the holders of said bonds," language was not sufficiently specific to make no-action clause in indenture applicable to bonds (internal quotation marks omitted)); *Berman v. Consol. Nev.–Utah Corp.,* 132 Misc. 462, 230 N.Y.S. 421, 424 (Sup.Ct. 1928) (holding that reference in bond to indenture was insufficient to make bond subject to no-action clause found in indenture); *Brown v. Mich. R.R. Co.,* 124 Misc. 630, 207 N.Y.S. 630, 631 (City Ct.1924) ("There is nothing on the face of the bond to show that there is any provision in the mortgage preventing the owner of any bond from maintaining an action at law for the money when the same becomes due."); *see also Marlor v. Tex. & Pac. Ry. Co.,* 19 F. 867, 868 (C.C.S.D.N.Y. 1884) (applying New York law; finding "nothing in the language of the mortgage to qualify the promise of the bond" and noting that "[w]hether [a bondholder's] interest can be collected through a foreclosure of the mortgage is a different inquiry, and not relevant now [to the suit on the bond]"), *aff'd,* 123 U.S. 687, 8 S.Ct. 311, 31 L.Ed. 303 (1887).
Other jurisdictions reached the same result. *See, e.g., Kimber v. Gunnell Gold Mining &* *Milling Co.,* 126 F. 137, 138 (8th Cir.1903) ("A mortgage ... does not, in the absence of an express stipulation or of a statute to that effect, constitute any defense to an action at law against the mortgagor by each of the creditors upon the bonds or primary obligations thus secured."); *Manning v. Norfolk S. Ry. Co.,* 29 F. 838, 839 (C.C.E.D.Va.1887) ("The common-law right of suing to judgment upon a written obligation admitted to be valid is of too high a character to be taken away by implications, especially if these are drawn from instruments other than that which is given in direct and positive acknowledgement of the debt."); *Mendelson v. Realty Morg. Corp.,* 257 Mich. 442, 241 N.W. 154, 154 (1932) ("[I]t is a fact, recognized alike by business and the law, that a bond and its securing mortgage have different functions, are governed by different legal principles, and, for some purposes at least, are separate contracts."); *Reitz v. Pontiac Realty Co.,* 316 Mo. 1257, 293 S.W. 382, 385 (1927) ("The [no-action] provisions of the mortgage ... deal with remedies provided for in the mortgage, and have no reference to respondent's right of action [on the bonds] at common law."); *Putnam v. Pittsburgh Rys. Co.,* 330 Pa. 210, 199 A. 211, 212 (1938) ("The right of the individual owner of bonds to sue thereon is not affected by provisions of the mortgage securing them unless such provisions exclude the right in express terms or by necessary implication."); *Phila. & Balt. Cent. R.R. Co. v. Johnson,* 54 Pa. 127, 129 (1867) (holding that in an action not "upon the mortgage" but for default in payment on the bonds, a "limitation" in the mortgage was "irrelevant"). *See generally* Leonard A. Jones, *A Treatise on the Law of Corporate Bonds and Mortgages* § 196a (3d ed. 1907) ("A provision restraining proceedings for foreclosure on the part of individual bondholders until after a requisition made upon trustees by a certain proportion of the bondholders and a refusal to comply

poses, New York courts held that even if the language of the bond sufficiently referenced the terms of the indenture, a no-action clause in the indenture that only referred to the indenture would not limit a creditor from suing on the bond.[5]

For example, in *General Investment Co. v. Interborough Rapid Transit Co.*, 200 A.D. 794, 193 N.Y.S. 903 (1922), *aff'd*, 235 N.Y. 133, 139 N.E. 216 (1923), the plaintiff sought to recover on five promissory notes. Each of the notes referred to an indenture for the holder's rights. The issuer invoked the no-action clause in the indenture, which stated: "No holder of any note hereby secured shall have any right to institute any suit, action or proceeding in equity or at law for the enforcement of this indenture, or for the execution of any·trust hereof, or for the appointment of a receiver, or for any other remedy hereunder...." *Id.* at 905. The court held that the no-action clause

merely denied the holders of the notes "any right to institute any suit, action or proceeding in equity or at law for *the enforcement of this indenture*." ... But the action at bar is not to affect, disturb, or prejudice the lien of the collateral indenture or to enforce any right thereunder. The action is solely for the purpose of recovering on defendant's primary obligation to pay said moneys, with interest.... The remedies are entirely separate and distinct.... [T]he present action is not barred by the clause in question, as the action is not to enforce the indenture or any rights thereunder, or to secure any remedy or relief therein provided.... Said clause relates solely to the enforcement of the collateral security for the payment of said notes, and in no manner affects the action upon the notes themselves.

*Id.* at 909 (emphasis in original) (citation omitted). By contrast, if the note sufficiently referenced the terms of the indenture *and* the no-action clause encompassed the rights of holders under the bonds, then the no-action clause applied to a suit on the bonds.[6] Courts applying New York law adhere to these rules today.[7]

---

therewith is valid and obligatory upon the individual bondholders *as respects the enforcement of the security.*" (emphasis added)).

**5.** *See, e.g., Hibbs v. Brown*, 190 N.Y. 167, 173, 82 N.E. 1108 (1907) ("[T]he clauses [of the indenture] ... only relate to and control procedure under the trust indenture itself for the purpose of enforcing payment of coupons and do not for any other purposes work or permit a postponement of the time of payment of the coupons or prevent a bondholder from enforcing his ordinary and general remedies at law for the collection of such obligations."); *Barnes v. United Steel Works Corp.*, 11 N.Y.S.2d 161, 163 (Sup.Ct.1939) (accepting that bond sufficiently incorporated terms of indenture but holding that no-action clause did not apply to suit on the bond when it only addressed suits under the indenture); *Deutsch v. Gutehoffnungshutte*, 168 Misc. 872, 6 N.Y.S.2d 319, 322 (Sup.Ct.1938) (holding that no-action clause in the indenture "relates solely to the enforcement of collateral security for the repayment of the bonds and in no way affects the action on the bonds themselves").

**6.** *See, e.g., Lidgerwood v. Hale & Kilburn Corp.*, 47 F.2d 318, 320 (S.D.N.Y.1930) (applying New York law; finding that note sufficiently incorporated terms of indenture and that no-action clause in indenture barred suit on the notes after maturity where it applied to "the enforcement of any of the covenants or agreements herein or in the Notes contained" (internal quotation marks omitted)); *Friedman v. Am.–Nat'l Co.*, 172 Misc. 1044, 16 N.Y.S.2d 887, 887 (Sup.Ct.1939) (holding that debenture sufficiently incorporated indenture and that no-action clause governed suit for principal due where clause stated that "[a]ll rights of action on this debenture and the annexed interest coupons, except as otherwise provided by said agreement, are vested in said trustee, and the enforcement thereof is governed by the provisions of said trust agreement" (internal quotation marks omitted)); *Rudick v. Ulster & Del. R.R.*, 147 Misc. 637, 263 N.Y.S. 498, 500 (1928) (holding that bonds sufficiently incorporated by reference the no-action clause in the indenture and that "the language thereof plainly states that no holder shall have the right to institute any action at law or in equity for the collection of

Since the adoption of the Trust Indenture Act, it has rarely been necessary for holders of a covered issue to litigate whether they could assert a direct right to recover past due payments of principal or interest notwithstanding the language of a no-action clause. Bondholders instead have attempted to assert other types of direct claims. A series of illustrative decisions have construed no-action clauses in indentures governed by New York law to determine whether the bondholder claims could proceed.

The first major decision was *Cruden*, where holders of debentures sought to assert fraud and civil RICO claims. The no-action clauses in the governing indenture provided that unless its procedural requirements were followed, the holders did not have

> any right by virtue or by availing of any provision of this Indenture to institute any action or proceedings at law or in equity or in bankruptcy or otherwise, upon or under or with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder....

*Cruden II*, 957 F.2d at 967 (emphasis omitted). The district court held that the no-

action clause did *not* bar the fraud and RICO claims: "Plaintiffs' other claims are not made under the Indenture, such as the RICO and fraud claims. The Court finds that plaintiffs do have standing to bring suit on these claims as well, any restrictive provision of the Indentures being inapplicable to these claims." *Cruden v. Bank of N.Y.*, 1990 WL 131350, at *12 (S.D.N.Y. Sept. 4, 1990) (*"Cruden I"*), *aff'd in part, rev'd in part, Cruden II*, 957 F.2d 961 (2d Cir.1992). The district court then dismissed the fraud and RICO claims under statutes of limitations. *Id.* at *16, *18. On appeal, without commenting on the no-action clause analysis, the United States Court of Appeals for the Second Circuit reversed the limitations-based dismissal of the RICO claims and remanded the case for trial. *See* 957 F.2d at 974, 978. By directing the case to go forward, the Second Circuit indicated that it accepted the district court's interpretation of the no-action clause, which otherwise would have barred the claims.

The next significant decision was *Victor v. Riklis*, 1992 WL 122911 (S.D.N.Y. May 15, 1992), where debentureholders argued that *Cruden I* permitted them to bring fraud and RICO claims. The district court distinguished *Cruden I* because the no-action clauses in the two cases differed.

---

the principal or interest [absent compliance with its conditions]"); 1 *Mortgages and Mortgage Foreclosure in N.Y.* § 4:8 (2012) ("If in fact appropriate notice is given to the bondholder in his bond, provisions restricting and limiting the rights of bondholders to sue and enforce their obligations may be legally imposed, depending upon the wording of the instrument."); Posner, *supra*, at 775 (noting before the passage of the TIA that "the bondholder's power to sue at law on his matured bond, as well as upon his matured interest coupons, is at times nullified by references to the indenture made in the bond. In such cases, the reference clauses must be explicit....").

7. *See RJ Capital, S.A. v. Lexington Capital Funding III, Ltd.*, 2011 WL 3251554, at *6 n. 7 (S.D.N.Y. July 28, 2011) (applying plain language of no-action clause that extended to suits for payment of interest or principal on the bonds where plaintiffs did not argue that the TIA overrode the provision); *In re Envirodyne Indus., Inc.*, 174 B.R. 986, 994 (Bankr. N.D.Ill.1994) (interpreting no-action clause governed by New York law; holding that action to recover past due interest is a claim "under the Notes" and not governed by the no-action clause, which applied to claims "under the Indenture").

The *Cruden I* clause only referred to the indenture, but the *Victor* clause added the phrase "or the Securities." The *Victor* court held that the difference was dispositive:

> Victor relies on the district court's decision in *Cruden,* which held that a debentureholder's RICO and fraud claims were not barred by a no-action provision. *Cruden* is distinguishable from this case, however, because that no-action clause was not as broad as the one contained in the E–II indentures.... Accordingly, we find that the E–II indenture's reference to actions with respect to the securities as well as the indenture itself broadens the scope of the no-action clause to include Victor's RICO and fraud claims.

1992 WL 122911, at *6 n. 7 (citations omitted).

Perhaps the most influential decision for no-action clause jurisprudence was *Feldbaum,* in which Chancellor Allen applied New York law. Bondholders whose securities were governed by the same indentures considered in *Victor v. Riklis* contended that a restructuring (i) breached the implied covenant of good faith and fair dealing in the indentures, (ii) violated New York's prohibition against fraudulent transfers, and (iii) was the product of fraudulent misrepresentations. *See Feldbaum,* 1992 WL 119095, at *2–3. The defendants moved to dismiss, arguing that the no-action clause barred the claims. As Quadrant argued originally in this case, the *Feldbaum* plaintiffs asserted that the no-action clause applied only to claims for breach of express indenture provisions. Chancellor Allen disagreed:

> Given the purposes for which no-action clauses are designed, I cannot accept plaintiffs' position. No principled reason or factual particularity of this case is advanced that would justify this view.

In my opinion, no matter what legal theory a plaintiff advances, if the trustee is capable of satisfying its obligations, then any claim that can be enforced by the trustee on behalf of all bonds, other than a claim for recovery of past due interest or [principal], is subject to the terms of a no-action clause of this type. *Id.* at *6. Chancellor Allen later explained that the trustee would not be "capable of satisfying its obligations" if the suit alleged misconduct by the trustee. Absent such circumstances, "courts systematically conclude that, in consenting to no-action clauses by purchasing bonds, plaintiffs waive their rights to bring claims that are common to all bondholders, and thus can be prosecuted by the trustee...." *Id.* at *7.

Turning to the claims before him, Chancellor Allen held that the no-action clause governed the plaintiffs' implied covenant claims and the fraudulent conveyance claims. The harms those claims sought to address affected all bondholders proportionately, so it was up to the trustee to prosecute the claims on behalf of all bondholders. *Id.* at *7–8. The Chancellor reached the same conclusion about the fraud claims to the extent the complaint alleged that the bondholders were deprived of an opportunity to seek injunctive relief against the restructuring. *Id.* at *9. Such an injunction would have been sought on behalf of and inured to the benefit of all bondholders, making it relief that only the trustee could seek. To the extent the complaint alleged fraud that deprived the bondholders of an opportunity to sell their bonds in the market, the Chancellor held that the no-action clause would not apply. In *Feldbaum,* however, the alleged fraud consisted of the defendants' failure to disclose that the restructuring violated the indentures. The fraud claim therefore constituted an effort "to transmute a contract claim litigable only by the indenture

trustee into an individual fraud claim." *Id.* at *10. Chancellor Allen refused to credit this stratagem and dismissed the fraud claim as well. In substance, *Feldbaum* held that a no-action clause would apply to any remedy sought on behalf of all bondholders, but given the expansive language of the *Feldbaum* clause, that reading was entirely appropriate.

In *Lange,* another decision by this Court interpreting New York law, Chancellor Strine, then-Vice Chancellor, relied on *Feldbaum* when confronted with an identical no-action clause. *Lange,* 2002 WL 2005728, at *5–6. The plaintiff debentureholders contested the leveraged buyout of an allegedly insolvent issuer, contending that the defendants breached their fiduciary duties, effected fraudulent transfers, and aided and abetted the primary violations. *Id.* at *5. Chancellor Strine held that the no-action clause barred the claims.

> Per *Feldbaum,* the particular nature of a claim that is asserted on behalf of the Debentureholders as a class is not determinative of the applicability of [the no-action clause]; what is determinative is whether the claim is one with respect to the Indenture or the Debentures themselves. Each of the claims pled in the amended complaint clearly satisfies that test, as the Debentureholders' ability to press those claims depends entirely on their ownership of the Debentures and the adverse effect that certain actions have allegedly had on each Debentureholder, *pro rata* to her ownership of those securities.

*Id.* at *7. Because each of the claims could be asserted by the trustee, the plaintiffs could not proceed without complying with the no-action clause.

Two more recent decisions followed *Feldbaum* and *Lange.* In the *Wherehouse Entertainment* litigation, the issuing corporation failed to redeem outstanding debentures at a premium after the occurrence of an event that the plaintiffs contended triggered the redemption obligation. The plaintiffs asserted claims for breach of contract, breach of the implied covenant of good faith and fair dealing, tortious interference with contract, and fraudulent conveyance. *See McMahan & Co. v. Wherehouse Entm't, Inc.,* 859 F.Supp. 743, 745–46 (S.D.N.Y.1994), *aff'd in part, rev'd in part,* 65 F.3d 1044 (2d Cir.1995). Like the *Feldbaum/Lange* clause, the *Wherehouse Entertainment* clause barred the debentureholders from seeking "any remedy with respect to [the] Indenture or the Securities" unless they first complied with its terms. *Id.* at 747. The court held that the state law claims sought a remedy with respect to the securities and dismissed the claims. *Id.* at 747–48.

Similarly in the *Akanthos* litigation, bondholders argued that certain transactions engaged in by the issuing corporation constituted illegal fraudulent transfers. *See Akanthos Capital Mgmt., LLC v. CompuCredit Hldgs. Corp.,* 677 F.3d 1286 (11th Cir.2012). Like the *Feldbaum/Lange* clause, the *Akanthos* clause stated that noteholders " 'may not pursue any remedy with respect to the Indenture or the Securities' " without first complying with the requirements of the clause. *Id.* at 1289. The United States Court of Appeals for the Eleventh Circuit held that the clause applied, finding it "clear that Plaintiffs' suit relates to the trust indentures or the securities." *Id.* at 1293. In reaching this conclusion, the court relied on and quoted extensively from *Feldbaum* and *Lange.*

Consistent with the pre-TIA decisions, the foregoing authorities indicate that the effect of a no-action clause depends on its language. In *Cruden,* where the no-action clause paralleled the Athilon Clause and

applied only to attempts to assert rights grounded in the indenture, the district court permitted the plaintiffs to assert claims arising from their status as noteholders, and the Court of Appeals implicitly agreed with this analysis. The other decisions all involved much broader no-action clauses like those in *Feldbaum* and *Lange*, and the courts consistently applied those expansive no-action clauses in accordance with their terms.

For their part, the defendants rely on two inapposite cases: *Walnut Place LLC v. Countrywide Home Loans, Inc.*, 96 A.D.3d 684, 948 N.Y.S.2d 580 (2012), and *Greenwich Financial Services Distressed Mortgage Fund 3, LLC v. Countrywide Financial Corp.*, No. 650474/2008, 2010 WL 9525799 (N.Y.Sup.Ct. Oct. 7, 2010). In both cases, the defendants issued certificates, analogous to notes, pursuant to pooling and service agreements ("PSAs"), analogous to an indenture. Holders of certificates alleged that the defendants breached representations and warranties in the PSAs. Both decisions held that the no-action clauses in the PSAs barred the claims. Neither decision addressed an attempt by certificate holders to invoke rights that did not depend on the PSAs. Both cases are comparable to an attempt by noteholders to assert a claim for breach of the indenture, which is a claim to which a no-action clause necessarily applies. *See* Foster, *supra* note 1, at n.3 ("Where the individual bondholder, in order to make out a cause of action, must rely upon some violation by the debtor of the terms of the trust indenture or like instrument securing the bond, then, rather plainly, the bondholder cannot maintain his action unless he has met such restrictive conditions as are imposed by the trust indenture in respect of actions by individual bondholders."). Subpart 3.0 of the Athilon Clause explicitly bars such a claim. Neither *Walnut Place* nor *Greenwich Financial* sheds light on the extent to which a New York court would apply the Athilon Clause to bar a claim that did not invoke a provision of the Indenture.

## C. Other Instructive Delaware Precedents

In *Feldbaum* and *Lange*, this Court interpreted expansive no-action clauses that were governed New York law. In other decisions, the Delaware Supreme Court and this Court have commented on narrower clauses and suggested that bondholders could bring claims that fell outside of the language of the clause. Unfortunately, these decisions have not made clear whether the indentures in question were governed by New York law. I discuss them for three reasons. First, they represent the only extant indications of the Delaware Supreme Court's views; second, given the prevalence of New York law in this area, some of the indentures may have been governed by New York law despite the absence of any reference in the opinion; and third, this Court has observed that there are no pertinent distinctions between New York law and Delaware law in this area. *See Tang Capital P'rs, LP v. Norton*, 2012 WL 3072347, at *4 & n. 15 (Del.Ch. July 27, 2012) (interpreting no-action clause in indenture with New York choice of law provision; noting that "[n]either party has cited and I am not aware of any case law indicating that the principles of contract interpretation under New York law, so far as relevant to this case, differ materially from those under Delaware law"); *Elliott Assocs., L.P. v. Bio–Response, Inc.*, 1989 WL 55070, at *3 n. 1 (Del.Ch. May 23, 1989) (interpreting no-action clause in indenture with New York choice of law provision; remarking that "there has been no showing that the law of New York differs from that of Delaware with respect to any of the matters at issue

here" and concluding that "it appears to be of no consequence which authorities are relied upon").

This line of Delaware decisions begins with *Harff v. Kerkorian*, 324 A.2d 215 (Del.Ch.1974) ("*Harff I*"), *aff'd in part, rev'd in part*, 347 A.2d 133 (Del.1975) ("*Harff II*"). There, holders of debentures claimed that they had been harmed by the declaration of an allegedly improper dividend, and they sued both derivatively and directly for breach of fiduciary duty. Chancellor Quillen dismissed their derivative claims for lack of standing. *Id.* at 220. The defendants argued that to the extent the same claims could be framed as direct causes of action, they were barred by a no-action clause in the related indenture, which provided that "[n]o holder of any Debenture shall have any right by virtue of or by availing of any provision of this Indenture to institute any suit, action or proceeding in equity or at law upon or under or with respect this Indenture...." *Id.* at 221 n. 5. Although the opinion did not quote the entire clause, the foregoing portion resembles the Athilon Clause.

In ruling on the debentureholders' class claims, Chancellor Quillen noted that "[t]he authorities cited by plaintiffs for the proposition that creditors can maintain an action against management for violation of rights which exist independently of the Indenture Agreement all involved either fraud or insolvency." *Id.* at 221. The Chancellor observed that the plaintiffs had not alleged that the corporation was insolvent, asserted any violation of a Delaware statute, or pled that the dividend amounted to fraud. *Id.* He concluded that "no fiduciary duties existed as between the parties and that the rights of the convertible debenture holders ... are confined to the terms of the Indenture Agreement." *Id.* at 222. In light of this holding, the Chancellor held that "[t]he effect of the

'no-action clause' ... need not be determined." *Id.*

On appeal, the Delaware Supreme Court affirmed the dismissal of the derivative claim, but reversed the dismissal of the direct claims. *Harff II*, 347 A.2d at 134. The Delaware Supreme Court held that the plaintiffs had pled adequately that the dividend amounted to fraud. *Id.* The Delaware Supreme Court accepted the plaintiffs' contention that "this 'tort claim is wholly unrelated to and unaffected by any contract rights that the plaintiffs may have under the Indenture Agreement.' " *Id.* The high court held that that "judgment in favor of the defendants in the class action is reversed and the cause remanded for trial of the issue of fraud." *Id.* As in *Cruden II*, the appellate decision did not comment on the no-action clause analysis.

*Harff II* implies that the Delaware Supreme Court believed a no-action clause with the same scope as the Athilon Clause would not bar the noteholders' individual claims for damages under a theory of fraud. In *Continental Illinois*, Justice Jacobs, then a Vice Chancellor, read *Harff II* in this fashion: "By recognizing that the debenture holders were entitled to proceed on a claim of fraud independent of the terms and limitations of the Indenture, the Supreme Court in *Harff* implicitly ruled that the no-action clause of the indenture would not bar an action for fraud." *Cont'l Ill. Nat'l Bank & Trust Co. of Chi. v. Hunt Int'l Res. Corp.*, 1987 WL 55826, at *5 (Del.Ch. Feb. 27, 1987); *see also Simons v. Cogan*, 549 A.2d 300, 303 (Del.1988) ("this Court permitted the class action in *Harff* to proceed because plaintiffs had brought themselves within the fraud exception").

In *Mann v. Oppenheimer*, Justice Walsh, then Vice Chancellor, reached the same conclusion about *Harff*. *See Mann v. Oppenheimer & Co.*, 1985 WL 11555 (Del.Ch. Apr. 4, 1985), *rev'd on other*

*grounds,* 517 A.2d 1056 (Del.1986). The plaintiffs in *Mann* owned subordinated debentures and challenged an exchange offer on grounds of fraud. The defendants relied on a no-action clause which stated, "no holder of any Debenture may institute any action to enforce any remedy under the Indenture unless the Trustee declines or fails to exercise its powers or to institute such action...." *Id.* at *3. The plaintiffs argued that the no-action clause only restricted "suits brought 'under or upon' the indenture." *Id.* Citing *Harff I,* Justice Walsh stated: "There is merit in plaintiffs' position. Even though this dispute may implicate the terms of the Indenture, the allegations of fraud and Federal security law violations are sufficient to support an independent action. Thus, the plaintiffs need not have given notice to the Trustee prior to bringing suit." *Id.* (citation omitted). Justice Walsh nevertheless granted summary judgment in favor of the defendants. *Id.* On appeal, the Delaware Supreme Court reversed and remanded so that the noteholder plaintiffs could take discovery on the common law fraud claims before the court addressed the defendants' motion for summary judgment. *See Mann v. Oppenheimer & Co.,* 517 A.2d 1056, 1060–61 (Del.1986). Although the Delaware Supreme Court did not explicitly address the no-action clause, its ruling was consistent with Justice Walsh's interpretation and inconsistent with the contrary position that the no-action clause barred the claims as a matter of law. *See Cont'l Ill.,* 1987 WL 55826, at *5 (interpreting *Mann* in this fashion).

Justice Berger, then Vice Chancellor, employed a similar analysis in *Mabon, Nugent & Co. v. Texas American Energy Corp.,* 1988 WL 5492 (Del.Ch. Jan. 27, 1988). The holders of debentures sued the issuer and its parent for breach of the indenture and for fraud, contending that the defendants misrepresented that the parent would assume the indenture. The defendants relied on a no-action clause. Although the language of the clause was not quoted in the opinion, Justice Berger described it as requiring that notice be given to the trustee and other procedural requirements met "before instituting any action for the enforcement of any remedy under the indenture." *Id.* at *2. Justice Berger held that the no-action clause only applied to the breach of contract claim: "Plaintiffs' remaining claims are not contractual and, therefore, the restrictions in the Indenture do not apply." *Id.* at *3 (citing *Cont'l Illinois,* 1987 WL 55826).

It bears noting that in *Lange,* Chancellor Strine declined to read the *Harff* cases as expressing any view on the scope of a no-action clause. 2002 WL 2005728, at *7 n. 21. On the merits, Chancellor Strine had held that the broad no-action clause at issue in *Lange* barred the noteholders claims for breach of fiduciary duty. *Id.* at *7. In a footnote, he observed that some earlier cases suggested that claims for breach of fiduciary duty could fall outside a no-action clause, citing *Continental Illinois,* and he traced "[m]ost of this confusion" to *Harff II.* He then asked,

> [D]id the *Harff* case hold that a no-action clause could not bar a bondholder suit alleging fraud or that the issuer was insolvent? The answer to that question is no. In *Harff,* the Court of Chancery expressly avoided any ruling on the scope of applicability of the no-action clause, and the Supreme Court never addressed it any discernible, articulated way.

2002 WL 2005728, at *7 n. 21. Notably, the *Lange* footnote framed the operative question as whether a no-action clause could bar a breach of fiduciary duty claim, not whether the specific language of the no-action clause at issue in *Harff* barred the

claim. As in the current case, the parties may not have focused at the trial court level on the specific wording of the two clauses, and the *Lange* decision did not parse the narrower no-action clause in *Harff* or contrast it with the broader no-action clause in *Lange*.

Taken together, the *Harff* cases and subsequent decisions indicate that the Athilon Clause applies only to claims under the Indenture and does not extend to claims that rely on other sources of law. The limited reading that these cases give to narrow no-action clauses parallels the approach taken by the authorities that explicitly apply New York law.

## D. Authoritative Commentary

Although New York law directs that indenture provisions be interpreted using standard principles of contract interpretation, "[c]ourts strive to give indenture provisions a consistent and uniform meaning because uniformity in interpretation is important to the efficiency of capital markets." *Concord Real Estate CDO 2006–1, Ltd. v. Bank of Am. N.A.*, 996 A.2d 324, 331 (Del.Ch.2010) (internal quotation marks omitted), *aff'd*, 15 A.3d 216 (Del. 2011) (TABLE). Experienced drafters deploy settled language:

> The preparation of an instrument of security intended to provide with artistic completeness for the ramifications of the modern corporate entity imposes upon its author the obligation to use wording that is well defined among those engaged in the interpretation of such indentures. To depart from well understood verbiage is to invite criticism and possibly to plunge the investor into the field of the unknown.

*Bond Issues* at 4.

"Courts enhance stability and uniformity of interpretation by looking to the multi-decade efforts of leading practitioners to develop model indenture provisions." *Concord Real Estate*, 996 A.2d at 331. These efforts began with the *Commentaries* in 1971 and continued with subsequent updates. *See, e.g., Revised Model Simplified Indenture*, 55 Bus. Law. 1115 (2000); *Model Simplified Indenture*, 38 Bus. Law. 741 (1983); *Mortgage Bond Indenture Form*, 36 Bus. Law. 1917 (1981).

The *Commentaries* "provide powerful evidence of the established commercial expectations of practitioners and market participants." *Concord Real Estate*, 996 A.2d at 331. "Where a standard term is the product of an explicit standard-setting process such as the model bond indenture or the model simplified indenture, commentaries of the standard-setting organization should be accorded authoritative weight." Marcel Kahan & Michael Klausner, *Standardization and Innovation in Corporate Contracting (or "The Economics of Boilerplate")*, 83 Va. L. Rev. 713, 765 (1997) (footnote omitted). The Delaware Supreme Court and other courts "have looked to the [*Commentaries* ] as 'an aid to drafting and construction' of common indenture language." *Bank of N.Y. Mellon Trust Co., N.A. v. Liberty Media Corp.*, 29 A.3d 225, 241 (Del.2011); *see Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 396–97 (Del.1996) (relying on *Commentaries* and subsequent versions of the model indenture).

The *Commentaries* contain a model no-action clause that resembles the Athilon Clause:

> No holder of any Debenture or coupon shall have any right to institute any proceeding, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless [the holder complies with the conditions in the clause].

*Commentaries, supra* note 3, § 5–7 at 232. Unlike the Athilon Clause, the *Commentaries'* model clause does not contain language similar to subpart 1.0 that explicitly addresses the source of the rights that a holder may invoke. It does, however, contain language similar to subparts 3.0 and 4.0 addressing the types of proceedings governed by the clause, *viz.,* those "with respect to this Indenture" or which seek "the appointment of a receiver or trustee, or for any other remedy hereunder." Notably, the model clause does not refer to proceedings "with respect to the Debentures," and the *Commentaries* stress this point: "Note that this limitation is only on suits under the indenture." *Id.* at 233. Reinforcing this observation, the *Commentaries* describe as a "curious case" a decision which held that a "holder of coupons for overdue interest on mortgage bonds issued under an indenture containing a provision similar to the [model no-action clause] could not maintain a suit on such coupons." *Id.* at 233 n.22 (referencing *Bartol v. Gottlieb–Bauernschmidt–Straus Brewing Co.,* 129 Md. 32, 98 A. 286 (1916)). The implication is that the plain language of the model no-action clause only applies to suits under the indenture or that seek specified remedies, but not to other suits, such as actions or proceedings that do not rely on the indenture and seek other remedies.

More recent authority confirms this interpretation. In 2000, the Ad Hoc Committee for Revision of the 1983 Modified Simplified Indenture, working under the aegis of the Committee on Developments in Business Financing of the American Bar Association's Section of Business Law and assisted by members of the Committee on Trust Indentures and Indenture Trustees and the Business Bankruptcy Committee's Subcommittee on Trust Indentures, produced a Revised Model Simplified Inden-

ture. *See Revised Model Simplified Indenture,* 55 Bus. Law. 1115 (2000); *see also Bank of N.Y.,* 29 A.3d at 242 (relying on the Revised Model Simplified Indenture and commentary). Its model no-action clause resembles the *Feldbaum/Lange* clause: "A Securityholder may pursue a remedy with respect to this Indenture or the Securities only if [the holder complies with the terms of the clause]." *Revised Model Simplified Indenture,* 55 Bus. Law. 1115, 1137–38 (2000).

Like the *Feldbaum/Lange* clause, the model clause applies to any efforts by a Securityholder to "pursue a remedy with respect to this Indenture or the Securities." Yet notwithstanding the broad language, the commentary to the provision states:

> The clause applies, however, only to suits brought to enforce contract rights under the Indenture or the Securities, not to suits asserting rights arising under other laws.

> Note that the introductory language requiring compliance prior to pursuing a remedy "with respect to this Indenture *or the Securities* " indicates merely that claims to enforce the contractual terms of the Securities (which may include rights incorporated from the Indenture) are likewise subject to the no-action clause (subject to the exclusion noted in the preceding paragraph).

*Id.* at 1191–92 (emphasis in original) (citations omitted). Thus, according to authoritative commentators, even a clause like the *Feldbaum/Lange* clause should not extend beyond contract rights. For purposes of the issue presented by the Remand Order, this commentary confirms that the Athilon Clause should receive a narrow reading.

## E. The Statutory Receivership Cases

There is one line of cases that· cuts against the preceding authorities and favors equating the Athilon Clause with the *Feldbaum/Lange* clause. When considering bondholders' petitions for a statutory receivership, judicial decisions have given a broad construction to no-action clauses paralleling the Athilon Clause. The defendants rely on *Tang*, which they say holds that the Athilon Clause must apply to any attempt by a noteholder to bring an action on a debt instrument. I read *Tang* and its predecessor cases as limited to statutory receiverships and not as speaking to other contexts, such as the claims in this case.

In *Tang*, noteholders petitioned ·for a statutory receivership under Section 291 of the Delaware General Corporation Law based on their status as creditors. *See* 8 *Del. C.* § 291 ("Whenever a corporation shall be insolvent, the Court of Chancery, on the application of any creditor or stockholder thereof, may, at any time, appoint 1 or more persons to be receivers of and for the corporation. . . ."). Like the Athilon Clause, the no-action clause in *Tang* provided that

> no Holder of any Note shall have any right by virtue or by availing of any provision of this Indenture to institute any suit, action or proceeding ·in equity or at law upon or under or with respect to this Indenture, or for the appointment of a receiver, trustee, liquidator, custodian or other similar official, or for any other remedy hereunder [without meeting specified conditions]. . . .

*Tang*, 2012 WL 3072347, at *3 (emphasis omitted). The noteholders argued that the no-action clause did not apply because they were not invoking a "right by virtue or by availing of any provision of this Indenture." The defendants responded that the no-action clause applied because the phrase " 'by virtue of or by availing of any provision [of this Indenture]' should be construed to bar actions that arise out of any rights or status conferred on the Note holders by the Indenture." *Id.* at *5. Vice Chancellor Glasscock commented that he "read the [no-action clause] as the Defendants do" and stated that he agreed that the phrase " 'by virtue of the Indenture' indicates coverage of such causes of action available to a plaintiff by virtue of its status as a Note holder." *Id.*

In support of their right to pursue a statutory receivership notwithstanding the no-action clause, the plaintiffs relied on *Noble v. European Mortgage & Investment Corp.*, 165 A. 157 (Del.Ch.1933). Vice Chancellor Glasscock declined to follow *Noble* and relied instead on *Elliott Associates*, in which Justice Berger, then Vice Chancellor, distinguished the earlier *Noble* decision. To understand this line of authority, it is helpful to start with *Noble* and work forward.

*Noble* was one of two opinions addressing whether a no-action clause applied to a claim for a statutory receiver that Chancellor Josiah O. Wolcott issued within a five month period. In *Noble*, Chancellor Wolcott considered whether a bondholder could obtain a statutory receivership in light of a no-action clause that applied to "any action or proceeding at law or in equity upon or in respect of this indenture, or for the execution of any trust or power hereof, or for any other remedy under or upon this indenture." 165 A. at 158 (internal quotation marks omitted). The issuer had defaulted on its interest payments, and the holders of the coupons sued for the overdue payments and for the appointment of a statutory receiver. Chancellor Wolcott noted that the petition for a statutory receiver did not seek a remedy "under or upon this indenture" and that no-action clauses were "strictly construed." *Id.* at 159. The coupon holders were

therefore "as much entitled to file a receivership bill under the statute as is any other creditor." *Id.*

Shortly thereafter, in *Tietjen v. United Post Offices Corp.,* 167 A. 846 (Del.Ch. 1933), Chancellor Wolcott considered a similar petition for a statutory receivership. The *Tietjen* no-action clause applied to "any suit, action or proceeding at law or in equity for the foreclosure of this indenture, or for the appointment of a receiver, or for any other remedy hereunder...." *Id.* at 847. The petitioner relied on *Noble,* but Chancellor Wolcott observed that "[w]hat clearly distinguishes the pending case from the *Noble* Case is this—that here the indenture in Section 1 of Article Seven expressly denies to any bondholder the right to sue for the appointment of a receiver unless the required request has been made of the trustees...." *Id.* In response to the petitioner's argument that the no-action clause applied only to "the appointment of a receiver ... hereunder," *viz.* under the terms of the indenture, Chancellor Wolcott explained that the no-action clause extended to any remedy that the trustee could obtain under the indenture, and that the language of the indenture demonstrated that the trustee could seek a statutory receiver:

> It is suggested by the complainant that the only sort of receiver which the prohibition referred to can be taken to contemplate is a receiver of the property under the indenture, and that inasmuch as the pending bill seeks a general receiver for the corporation and not of the property alone, the prohibition is not applicable. The answer to that suggestion I think is plain, for it is to be observed that the request and refusal are conditions precedent not only to the bondholders' right to sue for a receiver but as well to the bondholders' right to enforce any power or remedy given to

the trustees. Now among those powers which are given to the trustees is the one found in Section 5 of the same Article Seven, which is that in case any one of the defaults occurs under Section 2 (which defaults accelerate the maturity of the bonds) the trustees are "entitled as of right, without notice, to the appointment of a receiver ... of each and every [of] the rights and properties of the corporation, with power to operate and continue the business of the corporation, and with all other rights and powers of receivers in equity." This language clearly shows that the sort of receiver which the bondholders are forbidden to seek without satisfying the conditions precedent, is not of the limited type which operates only in a custodial capacity over the mortgaged property.

*Id.* at 847–48. Because the type of statutory receiver that the bondholders sought was one that the trustee could obtain under the indenture, Chancellor Wolcott dismissed the petition. *Id.* at 848.

*Tietjen* reached the same result as two contemporaneous New York decisions. *See Greene v. N.Y. United Hotels,* 236 A.D. 647, 260 N.Y.S. 405 (1932), *aff'd,* 204 Ind. 311, 183 N.E. 798 (1933); *Ernst v. Film Prod. Co.,* 148 Misc. 62, 264 N.Y.S. 227 (Sup.Ct.1933). In *Greene,* the no-action clause provided that

> [i]n order to promote and protect the equal and ratable rights of every holder of the Debentures and to avoid multiplicity of suits, all the Debentures shall be subject to the condition that no holder of any Debenture or coupon appertaining thereto shall have any right to institute any action, at law or in equity, under or growing out of any provision of this Indenture, or for the enforcement thereof, [without meeting its conditions].

260 N.Y.S. at 406. A single bondholder sought the appointment of a receiver be-

cause of the corporation's failure to pay interest coupons when due. The appellate court affirmed the dismissal of the petition on two grounds. First, the complaint did not plead compliance with the no-action clause, and the court stated without analysis that "[t]he plaintiff as a bondholder holds his securities subject to the condition of this underlying trust agreement and can maintain an action only upon the conditions specified in the trust agreement." *Id.* at 407. The court did not discuss whether the plaintiff had instituted an action "under or growing out of any provision of this indenture, or for the enforcement thereof." Second, the complaint requested a receiver but did not describe what the receiver would do. *Id.* The court held that the appointment of a receiver "is provisional" and "never ... the ultimate object of the action," hence the complaint was "fundamentally defective." *Id.* I suspect that under current pleading standards, it would be reasonable to infer that the petitioner wanted the receiver to cause the company to pay the interest on the past-due coupons. *See Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del.2011) (adopting "reasonable conceivability" as pleading standard in Delaware state court).

*Ernst* involved the same indenture litigated in *Relmar Holding Co. v. Paramount Publix Corp.*, 147 Misc. 824, 263 N.Y.S. 776 (Sup.Ct.1932), *aff'd*, 237 A.D. 870, 261 N.Y.S. 959 (1933). The no-action clause provided:

> In order to promote and protect the equal ratable right of every holder of the bonds and to avoid multiplicity of suits, all the bonds shall be subject to the condition that all rights of action thereon, or in respect thereof, or on or in respect of the coupons thereto appertaining, are vested exclusively in the

trustee under this indenture, and that no holder of any bond or coupon appertaining thereto shall have any right to institute any action, at law or in equity, upon the bonds or any of the appurtenant coupons, or growing out of any provision thereof, or of this indenture, or for the enforcement of this indenture [without complying with its conditions].

*Relmar*, 263 N.Y.S. at 777–78 (Sup.Ct. 1932). In *Relmar*, plaintiff bondholders contended that the issuance of a new series of bonds by one of Paramount's wholly owned subsidiaries violated the terms of the indenture, and the court had little difficulty holding that the no-action clause applied. *Id.*

In *Ernst*, the plaintiffs sought the appointment of a receiver on the grounds that the same issuance constituted a fraudulent conveyance. 264 N.Y.S. at 228. This time, the plaintiffs contended that they were not suing under the indenture but rather as creditors under the New York Debtor and Creditor Law. *Id.* The court held that the no-action clause applied to this claim as well:

> What [the plaintiffs] seek is a receiver *in a representative action* to set aside a transfer as fraudulent. The nature of their action shows that they are presuming to speak for all the bondholders and not for themselves alone. They are attempting to protect their rights under the indenture, but to be permitted to do so they must not contravene its terms.... As soon as the plaintiffs presumed to speak for all other bondholders, they necessarily brought in the collateral indenture, their right to do which is challenged as a question of fact.

*Id.* at 229. The court seemingly could have reached the same result simply by citing the plain language of the no-action clause, which encompassed not only rights

of action under the indenture but also rights under the bonds.

The outcomes in *Tietjen, Greene,* and *Ernst* reflected the rule at the time in most jurisdictions. *See* Smith, *supra* note 1 (collecting cases). By contrast, contemporaneous decisions from the New Jersey Court of Chancery held that no-action clauses must be interpreted strictly such that when a clause referred to a right of action by virtue of the indenture or a remedy under its terms, it did not bar a suit for a statutory receiver. *See Jennings v. Studebaker Corp.,* 112 N.J. Eq. 591, 165 A. 631 (N.J.Ch.1933); *Tachna v. Pressed Steel Car Co.,* 112 N.J. Eq. 174, 163 A. 806 (N.J.Ch.1933), *rev'd on other grounds,* 112 N.J. Eq. 411, 164 A. 413 (E. & A.1933); *Reinhardt v. Interstate Tele. Co.,* 71 N.J. Eq. 70, 63 A. 1097 (N.J.Ch. 1906). This did not mean that a New Jersey court would grant the petition for a statutory receiver, only that the no-action clause did not bar consideration of the petition on the merits. *See Jennings,* 165 A. at 633–34 (denying petition).

Against this backdrop, Justice Berger decided *Elliott Associates.* The plaintiffs held debentures and sought the appointment of a receiver for the issuer, Bio–Response, Inc under Section 291. They also claimed that Bio–Response had committed fraud and violated the implied covenant of good faith and fair dealing. *Elliott Assocs.,* 1989 WL 55070, at *1, *4. Citing *Harff I* and *II,* Justice Berger noted that "debenture holders may be able to seek relief outside of the indenture where there are 'special circumstances which affect the rights of the debenture holders as creditors of the corporation, e.g., fraud, insolvency, or a violation of a statute....'" *Id.* at *4. But Justice Berger held that (i) the complaint did not sufficiently allege fraud and (ii) the implied covenant of good faith and fair dealing did not give the plaintiffs

any rights other than those found in the indenture. *Id.*

This left the claim for a receiver, which Justice Berger held was barred by the no-action clause. Like the Athilon Clause and the provision in *Tang,* the no-action clause at issue in *Elliott Associates* stated:

No Holder of any Security shall have any right by virtue of or by availing of any provision of this Indenture to institute any action or proceeding at law or in equity or in bankruptcy or otherwise upon or under or with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder unless such Holder previously [complies with specified conditions].

*Id.* at *6. Justice Berger held that "[u]nlike the relevant clause in *Noble,* there is nothing in this Indenture reserving to plaintiffs the right to commence an action, 'so long as the procedure they adopt is not under the [I]ndenture'" and that "as in *Tietjen,* Debenture holders are expressly denied the right to bring an action for the appointment of a receiver without first following the specified procedure...." *Id.* at *7.

In *Tang,* Vice Chancellor Glasscock followed *Elliott Associates* on grounds of *stare decisis.* He noted that "[t]he language of the indenture's no-action clause in *Elliott* was nearly identical to that [in *Tang*]." 2012 WL 3072347, at *6. He therefore relied on *Elliott Associates* as "directly on point" and "not credibly refuted." *Id.*

In my view, the defendants are correct to point out the tension between the rulings in the Delaware statutory receivership cases and the plain language of the ·no-action clauses at issue. After excising the inapplicable language, the relevant portions of the *Tang* and *Elliott Associates* clauses stated: "No Holder of any Securi-

ty shall have any right by virtue of or by availing of any provision of this Indenture to institute any action or proceeding ... for the appointment of a receiver or trustee, or for any other remedy hereunder." The predicate requirement for triggering the clause was that the holder invoke a right "by virtue of or by availing of any provision of this Indenture." The plaintiffs, however, were not asserting any right "by virtue of or by availing of any provision of this Indenture," but rather under Section 291. Consistent with the New Jersey authorities, it would seem that the no-action clause would not apply to a petition for receivership that did not rely on the indenture. *Tietjen*, however, held that the reference to a receivership was sufficient to reach the opposite conclusion, creating a conceptual disconnect.

*Elliott Associates* relied on *Tietjen*, focused on the reference to "the appointment of a receiver" in the no-action clause, and did not dilate on the apparent limitation of the clause to claims "by virtue of or by availing of any provision of this Indenture." 1989 WL 55070, at *6. *Tang* reasoned through the conceptual disconnect and bridged the divide by holding that a suit "by virtue of or by availing of any provision of this Indenture" was the equivalent of a suit under the notes. To reach this result, the *Tang* court adopted the defendants' position that if the two prepositional phrases "by virtue of" and "by availing of" did not mean different things, then one would be rendered surplusage, an outcome contrary to standard principles of contract interpretation. 2012 WL 3072347, at *5. *Tang* gave meaning to both by interpreting the phrase "by availing of any provision of this Indenture" to refer to claims under the indenture itself while interpreting "by virtue of ... this Indenture" to encompass claims under the notes. *Id.*

As demonstrated by this authorities discussed in this opinion, some no-action clauses refer to claims under "the Indenture" while others refer to claims under "the Indenture or the Notes." The *Tang* approach eliminates any distinction between the two usages by transforming a no-action clause like the Athilon Clause into the functional equivalent of the following provision, in which the italicized language reflects alterations:

No Holder of any Note shall have any right by virtue of or by availing of any provision of this Indenture *or the Notes* to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Indenture *or the Notes*, or for the appointment of a receiver, trustee, liquidator, custodian or other similar official, or for any other remedy hereunder *or under the Notes*.

If applied to a no-action clause that already included the italicized references, the reasoning in *Tang* would render them meaningless because the phrase "by virtue of ... the Indenture" takes care of note-based claims. The no-surplusage rule thus contradicts itself: by not treating the phrase "by virtue of ... the Indenture" as surplusage, the phrase "or the Notes" becomes surplusage.

Under *Cruden II, Victor v. Riklis,* and pre-TIA decisions, including the phrase "or the Notes" changes the scope of the no-action clause. These authorities indicate that if one of the two phrases is redundant, it is "by virtue of." It consequently seems preferable to regard the compound prepositional phrase "by virtue of" or by availing of as an example of the law's hoary tradition of deploying joint terms, such as "indemnify and hold harmless," where technically one term would suffice. *See, e.g., Majkowski v. Am. Imaging Mgmt. Servs., LLC,* 913 A.2d 572, 588 (Del.Ch.2006) (declining to give separate

meaning to the phrase "hold harmless"; noting that "[t]he terms 'indemnify' and 'hold harmless' have a long history of joint use throughout the lexicon of Anglo–American legal practice"). *See generally* Bryan A. Garner, *The Redbook: A Manual on Legal Style* § 11.2 at 192 (2d ed. 2006) ("The doublet and triplet phrasing common in Middle English still survives in legal writing, especially contracts, wills, and trusts. That's probably the worst possible soil for it to grow in because those who interpret legal writing are impelled to strain for distinctions so that no word is rendered surplusage. Yet that is exactly all but one word … is [in these phrases]."). Under this reading, the Athilon Clause would not encompass a petition for a statutory receivership, which is not to say that a no-action clause could not be drafted to reach such a petition. The *Feldbaum/Lange* clause would bar a statutory receivership action, because through such an action a "Securityholder" would be pursuing a "remedy with respect to this Indenture or the Securities."

The Complaint does not seek a statutory receivership, so for purposes of the issue raised by the Remand Order, this Court is not required to follow the decisions in *Tietjen*, *Elliott Associates*, and *Tang* on grounds of *stare decisis*. Rather, the tension between these opinions and other decisions suggests that the receivership cases should not be relied upon to expand the scope of the Athilon Clause to include claims under the Notes.

## F. Applying The Athilon Clause To Quadrant's Claims

The foregoing review of cases and authorities indicates that each noteholder claim must be measured against the particular language of the no-action clause in question. In this case, the Athilon Clause applies to Counts VII and VIII in their entirety and to Count X to the extent it alleges a conspiracy to engage in the wrongs alleged in Counts VII and VIII. Otherwise, the Athilon Clause does not apply to the Complaint.

### 1. Count I: Breach Of Fiduciary Duty

In Count I of the Complaint, Quadrant asserts a derivative claim on behalf of Athilon against the individual defendants for breach of fiduciary duty. In *Feldbaum* and *Lange*, this Court held that the no-action clause at issue in those cases barred similar claims for breach of fiduciary duty. *See Feldbaum*, 1992 WL 119095, at *6–8; *Lange*, 2002 WL 2005728, at *7. Based on the arguments previously made at the trial level, *Lange* and *Feldbaum* were "directly on point." Dismissal Order ¶ 1.

The Athilon Clause, however, only extends to actions or proceedings where a noteholder claims a right "by virtue or by availing of any provision of this Indenture." In Count I, Quadrant relies on its status as a creditor under the Notes, its allegation that Athilon is insolvent, and the doctrine of creditor standing articulated by the Delaware Supreme Court in *North American Catholic Educational Programming Foundation, Inc. v. Gheewalla*, 930 A.2d 92, 101–02 (Del.2007). Quadrant does not rely on any provision of the Indenture. It therefore appears, based on the argument Quadrant made on appeal and the authorities considered on remand, that *Lange* and *Feldbaum* are not controlling and that the plain language of the Athilon Clause does not extend to a *Gheewalla* claim.

*Levy v. Paramount Publix Corp.*, 149 Misc. 129, 266 N.Y.S. 271 (Sup.Ct.1933), *aff'd*, 241 A.D. 711, 269 N.Y.S.2d 997 (1934), a case cited in *Lange*, does not compel a different result. The *Levy* decision construed the same no-action clause

addressed in *Relmar* and *Ernst,* quoted above. The no-action clause expressly encompassed rights of action on the bonds, "or in respect thereof," and barred any holder of the bonds from instituting any action "upon the Bonds . . . or growing out of any provision thereof." *Levy,* 266 N.Y.S. at 273. Like the no-action clause in *Lange,* the no-action clause in *Levy* was not limited to rights under the indenture. Moreover, the court in *Levy* does not appear to have relied on the no-action clause to dispose of the breach of fiduciary duty claim, which failed on other grounds. *Id.* at 273–76. *Levy* reinforces the principle that the plain language of the no-action clause controls.

### 2. Count II: Aiding and Abetting A Breach Of Fiduciary Duty

In Count II of the Complaint, Quadrant asserts a derivative claim on behalf of Athilon for aiding and abetting the breaches of fiduciary duty alleged in Count I. In *Feldbaum,* this Court held that a no-action clause "applies equally to claims against non-issuer defendants as to claims against issuers." 1992 WL 119095, at *7. With that additional analytical step, the analysis of Count I applies equally to Count II, both as to the initial ruling in the Dismissal Order and for purposes of the Remand Order.

### 3. Count III: Permanent Injunction Based On Breach of Duty

In Count III of the Complaint, Quadrant seeks a permanent injunction barring the individual defendants from causing Athilon to make interest payments on the Junior Notes or to pay the service and license fees identified in Count I. For purposes of the Athilon Clause, the analysis is the same as Count I, both as to the initial ruling in the Dismissal Order and for purposes of the Remand Order.

### 4. Counts IV And V: Fraudulent Conveyance

In Counts IV and V, Quadrant challenges the payment of interest on the Junior Notes and the service and license fees paid to EBF and ASIA as fraudulent transfers. In *Lange* and *Feldbaum,* this Court held that the no-action clause at issue in those cases barred similar claims for fraudulent transfer. *See Feldbaum,* 1992 WL 119095, at *6–8; *Lange,* 2002 WL 2005728, at *7. Based on the arguments previously made at the trial level, *Lange* and *Feldbaum* seemed "directly on point." Dismissal Order ¶ 1.

The Athilon Clause only extends to actions or proceedings where a noteholder claims a right "by virtue or by availing of any provision of this Indenture." In Counts IV and V, Quadrant relies on its status as a creditor under the Notes, its allegation that Athilon is insolvent, and provisions of the DFTA. *See* 6 *Del. C.* §§ 1304(a)(1), 1305(b). Quadrant does not rely on any provision of the Indenture. It therefore appears, based on the argument Quadrant made on appeal and the authorities considered on remand, that *Lange* and *Feldbaum* are not controlling.

*Lange* and *Feldbaum* cited New York cases for the proposition that no-action clauses can bar fraudulent transfer claims. Clearly this is so, but whether it is true in a particular case depends on the specific language of the clause. *Feldbaum* relied on the *Ernst* case, and *Lange* relied on both *Levy* and *Ernst. See Feldbaum,* 1992 WL 119095, at *6; *Lange,* 2002 WL 2005728, at *7 n. 19. As discussed, the no-action clause in *Levy* and *Ernst* explicitly included rights of action on the bonds, "or in respect thereof," and barred any holder of the bonds from instituting any action "upon the Bonds . . . or growing out of any provision thereof." *Levy,* 266 N.Y.S. at 273. The *Lange* decision also relied on

*Victor v. Riklis* and *Wherehouse Entertainment. See Lange,* 2002 WL 2005728, at *7 n. 18. As discussed, both decisions interpreted a no-action clause identical to the *Feldbaum/Lange* clause, which barred the debentureholders from seeking "any remedy with respect to [the] Indenture or the Securities" unless they first complied with its terms. Each ruling turned on the broad scope of the no-action clause at issue. None stands for the proposition that every no-action clause, however worded, necessarily bars fraudulent transfer claims.

### 5. Count VI: Permanent Injunction Based On Fraudulent Conveyance

Count VI seeks a permanent injunction under the DFTA against continuing payments of interest on the Junior Notes and service and license fees to EBF and ASIA. For purposes of the Athilon Clause, the analysis is the same as Counts IV and V, both as to the initial ruling in the Dismissal Order and for purposes of the Remand Order.

### 6. Count VII: Implied Covenant Of Good Faith And Fair Dealing

Count VII contends that by taking the actions detailed in Count I and elsewhere in the Complaint, Athilon breached the implied covenant of good faith and fair dealing that inheres in the Indenture. In *Feldbaum,* this Court held that the no-action clause at issue barred a claim for breach of the implied covenant. *See Feldbaum,* 1992 WL 119095, at *6. The Dismissal Order relied on *Feldbaum.* Neither the argument debuted by Quadrant on appeal, nor the authorities considered on remand suggest a different result.

"New York law recognizes an implied duty of good faith and fair dealing as part of its contract law." *Rossdeutscher v. Viacom, Inc.,* 768 A.2d 8, 20 (Del.2001). The implied obligation encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Dalton v. Educ. Testing Serv.,* 87 N.Y.2d 384, 639 N.Y.S.2d 977, 663 N.E.2d 289, 291 (1995). The resulting contract term is "implicit in the agreement as a whole." *Rowe v. Great Atl. & Pac. Tea Co.,* 46 N.Y.2d 62, 412 N.Y.S.2d 827, 385 N.E.2d 566, 570 (1978). "A breach of the implied covenant is a breach of contract." *Rossdeutscher,* 768 A.2d at 20.

By invoking the implied covenant, Quadrant sued to enforce an implied term of the Indenture. Count VII of the Complaint even references the Indenture. The Athilon Clause applies to any action or proceeding "upon or under or with respect to this Indenture." Dkt. 32 Ex. A. at 51. Quadrant's failure to comply with the Athilon Clause is fatal to its implied covenant claim. *Simons,* 549 A.2d at 305.

### 7. Count VIII: Tortious Interference With The Implied Covenant

Count VIII contends that EBF tortiously interfered with Athilon's obligations under the implied covenant of good faith and fair dealing that inheres in the Indenture. Such a claim on its face asserts a right "by virtue or by availing of any provision of [the] Indenture" and constitutes an action "upon or under or with respect to [the] Indenture." It is therefore covered by plain language of the Athilon Clause.

Two New York cases support this result. In *RJ Capital,* the United States District Court for the Southern District of New York interpreted a no-action clause which provided that "[n]o Holder of any Note shall have any right to institute any Proceedings, judicial or otherwise, with respect to his Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder [without comply-

ing with its terms]." *RJ Capital*, 2011 WL 3251554, at \*5. Elsewhere, the indenture made the rights of noteholders to sue for principal and interest "subject to the provisions of [the no-action clause]," and the noteholders did not argue that the TIA overrode this provision. *Id.* at \*6 n. 6 (emphasis omitted). The noteholders contended that the collateral manager for the debt securities tortiously interfered with the terms of the indenture by issuing inaccurate reports that the issuer then used to calculate the payments of principal and interest required by the indenture. The court held that the no-action clause barred the claim for tortious interference, but also dismissed the claim on the merits. *Id.* at \*7, \*14. Similarly in *Emmet & Co. v. Catholic Health East*, 37 Misc.3d 854, 951 N.Y.S.2d 846 (Sup.Ct.2012), the court held that a no-action clause applied to a claim for tortious interference with rights under an indenture, although the court did not quote the language of the clause. *Id.* at 849–50 (applying New York law because of lack of conflict with the law of the jurisdictions chosen under the indentures).

### 8. Count IX: Constructive Dividends In Violation Of Delaware Law

Count IX asserts that Athilon paid constructive dividends in violation of Delaware law and seeks to recover those payments from the individual defendants. Under the reasoning of *Feldbaum* and *Lange*, such a claim should be barred. *See Feldbaum*, 1992 WL 119095, at \*6 ("[N]o matter what legal theory a plaintiff advances, if the trustee is capable of satisfying its obligations, then any claim that can be enforced by· the trustee on behalf of all bonds, other than a claim for the recovery of past due interest or [principal], is subject to the terms of a no-action clause of this type."); *accord Lange*, 2002 WL 2005728, at \*7 (quoting *Feldbaum* ).

Unlike the *Feldbaum/Lange* clause, the Athilon Clause only extends to actions or proceedings where a noteholder claims a right "by virtue or by availing of any provision of this Indenture." In Count IX, Quadrant relies on its status as a creditor under the Notes and Sections 170, 173, and 174 of the Delaware General Corporation Law. *See* 8 *Del. C.* §§ 170, 173, 174. The Athilon Clause does not reach such a claim. *See Regan v. Prudence Co.*, 17 N.Y.S.2d 422, 425 (Sup.Ct.1939) (holding that no-action clause did not apply to a suit for to recover dividends under New York's Stock Corporation Law).

The defendants cite *Norte & Co. v. Manor Healthcare Corp.*, 1985 WL 44684 (Del.Ch. Nov. 21, 1985), as standing for the proposition that a no-action clause applies to a claim alleging constructive dividends, but the *Norte* plaintiffs contended that defendants paid "constructive dividend in violation of various provisions in the trust indentures." *Id.* at \*5. By relying on provisions of the trust indentures, the *Norte* plaintiffs brought the claim within the scope of the no-action clause in that case. Had Quadrant made a similar argument here, then the Athilon Clause would apply.

Count IX does not allege constructive dividends that violated the Indenture; rather, it alleges constructive dividends that violated the General Corporation Law. It therefore appears, based on the argument Quadrant made on appeal and the authorities considered on remand, that *Lange* and *Feldbaum* are not controlling.

### 9. Count X: Civil Conspiracy

Count X asserts a claim for civil conspiracy against EBF and ASIA for actions taken in concert with the individual defendants. In *Feldbaum*, this Court held that a no-action clause "applies equally to claims against non-issuer defendants as against issuers." 1992 WL 119095, at \*7.

Count X seeks to impose secondary liability on other defendants for conspiring in the primary wrongs detailed in other counts of the Complaint. In my view, the Athilon Clause should apply to Count X to the same degree as it applies to the primary wrongs. As a practical matter, this means that the Athilon Clause bars the plaintiffs' ability to recover against secondary actors for conspiring to commit the wrongs alleged in Counts VII and VIII. Otherwise the Athilon Clause does not apply.

### III. CONCLUSION

As directed by the Remand Order, this opinion has analyzed the significance under New York law of the differences between the no-action clauses in the *Lange* and *Feldbaum* indentures and the Athilon indentures. The analysis has included a discussion of decisions by New York courts and other courts applying New York law. This opinion has not addressed other arguments about the Athilon Clause that Quadrant raised on appeal but which were not the subject of the Remand Order.

It appears that as a matter of New York law, the differences between the Athilon Clause and the *Feldbaum/Lange* clause are significant. Based on the analysis presented, the Athilon Clause does not apply to Counts I through VI and IX of the Complaint, or to Count X to the extent it seeks to impose liability on secondary actors for violations of the other counts. The clause applies to Counts VII and VIII of the Complaint, subject to the outcome of Quadrant's other arguments on appeal.